City of El Paso v. PUC 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 



ON MOTION FOR REHEARING


 




NO. 3-90-007-CV





CITY OF EL PASO, THE STATE OF TEXAS


AND OFFICE OF PUBLIC UTILITY COUNSEL,




 
 APPELLANTS


vs.





PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,




 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT



NO. 446,925, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING



 




 The opinion and judgment issued by this Court on August 14, 1991, are withdrawn,
and this opinion is filed in place of the earlier one.

 The district court affirmed an order of the Public Utility Commission
("Commission") setting rates to be charged by El Paso Electric Company ("EPEC"). The
Commission issued the order, after hearing, pursuant to the Public Utility Regulatory Act
(PURA), Tex. Rev. Civ. Stat. Ann. art. 1446c (Supp. 1992). The City of El Paso ("City"), the
State of Texas (on behalf of various state agencies located in western Texas) ("TSA"), and the
Office of Public Utility Counsel ("OPC"), appellants, seek reversal of the trial court's judgment. 
We will affirm in part and reverse in part.

 Disapproving of EPEC's decision to invest in the Arizona Nuclear Power Project,
appellants complain of the Commission's order permitting EPEC to charge rates that allow it to
recover most of the project's costs. The Commission ordered the rate increase after conducting
a lengthy evidentiary hearing, providing many opportunities for all parties to plead and present
their cases; the Commission considered two sets of motions for rehearing. The Travis County
district court, to which the complaining parties brought their appeal, affirmed the Commission's
order.

 On appeal, appellants challenge twelve different aspects of the Commission's
decision: (1) adoption of a non-unanimous stipulation; (2) failure to disallow more for
"decisional" imprudence; (3) approval of deferred accounting for regulatory-lag expenses; (4)
failure to disallow more for constructional imprudence; (5) exclusion of witness Hubbard's
testimony; (6) refusal to find excess capacity in EPEC's system; (7) inclusion of common facilities
in rate base; (8) inclusion of income tax expense in cost of service; (9) inclusion of a portion of
Unit 2 lease payments in cost of service; (10) calculation and inclusion of other cost-of-service
allowances; (11) temporary exclusion of TSA from the proceedings; (12) determination of rates
and rate class for TSA. We will reverse the trial court's judgment to the extent it affirmed the
Commission's approval and use of "deferred accounting" for the carrying costs EPEC incurred
between the date the Palo Verde plant became commercially operational and the date the new rates
were effective; we will affirm the remainder of the trial court's judgment.


SETTING


 At the heart of this dispute is EPEC's decision to expand its power generation
system by obtaining an ownership interest in the Arizona Nuclear Power Project, also known as
the Palo Verde Nuclear Generating Station. EPEC and four other utility companies agreed to
partially fund and otherwise assist in building one or more nuclear steam electric generating units,
with attendant common facilities. In return, EPEC was entitled to 15.8% of the resulting net
energy generation and the same percentage of available generating capability. Construction is
complete on the common facilities and two of the five units originally planned. At the time this
proceeding was heard by the Commission, a third unit was still under construction.

 Factors arising after construction began have induced EPEC to alter its ownership
interest in the units. Originally, EPEC owned an undivided interest in each of the units as a
tenant in common with the other four project participants. Although EPEC retains its undivided
interest in Unit 1, the company has sold its interest in Unit 2 and made arrangements to lease the
unit back for the duration of EPEC's involvement in the project.

 Because of the complexity of appellants' points of error, we will supply additional
facts from the record throughout this opinion as necessary to clarify the discussion.



PROCEDURAL BACKGROUND


 On October 31, 1986, EPEC filed an application requesting the Commission to
determine whether EPEC's arrangement to sell and lease back its ownership interest in Unit 2 was
in the public interest. On April 6, 1987, EPEC filed applications with various affected cities and
the Commission to raise its rates based on the inclusion of the new nuclear plant in its generation
system. The City of El Paso, one of the affected cities, approved rates within the El Paso city
limits that would not have allowed EPEC to recover any of its nuclear plant investment; EPEC
appealed the City's decision to the Commission. The Commission consolidated EPEC's appeal
with its appeals from the decisions of other municipalities and with the environs case (affecting
areas outside the cities) that was already before it. (1)

 Because of the voluminous evidence to be presented, the Commission initially
divided the proceedings in the rate case into three phases. The Commission added a fourth phase
after several parties tendered a non-unanimous "stipulation" to the Commission and requested that
the Commission base its decision on the stipulation. In addition, pursuant to an agreed motion,
the Commission consolidated the rate case with the proceeding to approve the sale/leaseback
arrangement. An examiner convened hearings on each of the four phases during August,
September, October, and November of 1987. On February 1, 1988, the hearings examiner filed
a report with the Commission recommending against adoption of the stipulation.

 On March 31, 1988, the Commission signed an order adopting and incorporating
the terms of an amended and restated stipulation and increasing rates to permit EPEC to earn a
return on part of its investment. The order withheld approval of the sale/leaseback arrangement
until a later proceeding, effectively undoing the earlier consolidation. On May 10, 1988, the
Commission made minor changes to its order in response to motions for rehearing filed by the
City, OPC, TSA, and others. The City, OPC, and TSA filed second motions for rehearing which
the Commission overruled on June 16, 1988. 

 The City, OPC, and TSA each appealed the Commission's order to a Travis County
district court, and the Commission obtained a consolidation of those appeals. All the appellants
participated in the ensuing district-court review, which resulted in an affirmance of the
Commission's order. The City, OPC, and TSA each raise several challenges to the trial court's
judgment and, through it, to the Commission's order. 


THE NON-UNANIMOUS STIPULATION


 The threshold complaint of the City and OPC is that the Commission erred in
basing its final order, in part, on a non-unanimous stipulation. Both appellants argue that there
is no substantial evidence to support the stipulated matters and that the Commission violated its
own procedural rules by considering the stipulation. In addition, OPC asserts that some necessary
findings or statements of underlying facts are lacking and that, by considering and basing its final
order on the stipulation, the Commission "improperly attempt[ed] to negate statutorily created
rights belonging solely to OPC." 

 An unarticulated assumption underlies the majority of appellants' challenges to the
Commission's decision in these and other points of error; although they do not say so explicitly,
appellants impliedly urge us to presume that, by basing its final order partially on stipulated
matters, the Commission completely abdicated its responsibility to determine disputed issues. We
may not so presume; indeed, the law compels a contrary presumption. In reviewing a challenged
administrative order, we must presume its validity. The challenger bears the burden of showing
error. Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453
(Tex. 1984); Continental Cars, Inc. v. Texas Motor Vehicle Comm'n, 697 S.W.2d 438, 441 (Tex.
App. 1985, writ ref'd n.r.e.).

 We may not substitute our discretion or our judgment for that of the agency; we
may reverse an agency's decision only if it is unsupported by substantial evidence, is arbitrary,
or results from an abuse of discretion. Railroad Comm'n v. Continental Bus System, Inc., 616
S.W.2d 179, 181 (Tex. 1981). An agency's decision is arbitrary or results from an abuse of
discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2)
considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to
consider but still reaches a completely unreasonable result. Gerst v. Nixon, 411 S.W.2d 350, 360
n.8 (Tex. 1966); Statewide Convoy Trans., Inc. v. Railroad Comm'n, 753 S.W.2d 800, 804 (Tex.
App. 1988, no writ).

 Appellants analogize the present case to a civil cause in which the court has
rendered an agreed judgment without the consent of all parties. The analogy is not apt. In the
present case, the decision-maker did not impose the terms of a settlement on non-settling parties. 
Although the parties signing the stipulation believed its terms fairly resolved disputed issues, (2)
tender of the stipulation to the examiner did not bind the Commission to "adopt" it. Furthermore,
the Commission did not, as appellants suggest we presume, adopt the stipulation as its final order
without scrutiny.

 The non-signing parties had ample opportunity to argue their positions both before
and after the Commission rendered its decision. A fourth phase was added to the hearings to
provide a forum in which parties could object to the Commission's use of the stipulation as a
partial basis for its final order. In addition to presenting evidence, the parties submitted briefs
concerning use of the stipulation, filed exceptions to the proposed final order incorporating
stipulated matters, and moved for rehearing after the Commission rendered its decision. Having
urged their objections to the Commission's use of the stipulation at each of these stages, appellants
yet failed to show that basing a final order on a non-unanimous stipulation would be improper.

 In a similar case, coincidentally involving the Palo Verde Nuclear Generating
Station, the New Mexico Supreme Court approved the state Public Service Commission's adoption
of a non-unanimous stipulation:

[The Commission] can adopt a contested stipulation by, first, affording any non-stipulating party an opportunity to be heard on the merits of the stipulation (i.e.,
whether it is a fair and reasonable resolution of the controversy before the
Commission) and second, making an independent finding, supported by substantial
evidence in the record, that the stipulation does indeed resolve the matters in
dispute in a way that is fair, just and reasonable and in the public interest.


Attorney General of New Mexico v. New Mexico Public Service Comm'n, 808 P.2d 606, 610
(N.M. 1991). The New Mexico court relied on Mobil Oil Corp. v. Federal Power Commission,
417 U.S. 283 (1974), where the United States Supreme Court noted the distinction between
considering a proposal "as a settlement" and considering it "on its merits": "[E]ven if there is a
lack of unanimity [in the stipulation], it may be adopted as a resolution on the merits . . . ." 417
U.S. at 414 (quoting Placid Oil Co. v. FPC, 483 F.2d 880, 893 (5th Cir. 1973)) (emphasis in
original).

 In the present case, the requirements mentioned in the foregoing cases for the
adoption of a non-unanimous stipulation were satisfied. First, the non-stipulating parties were
given an opportunity to be heard on the merits of the stipulation. Indeed, as stated above, the
Commission added a fourth phase to the proceedings devoted exclusively to receiving evidence
and argument on the propriety of using the stipulation as a basis for resolving the contested issues. 
Second, the Commission made the requisite independent findings. The initial part of the
Commission's Order recited:


4. Even where some parties to a proceeding do not agree to a stipulated result, it
is reasonable to adopt such a stipulation if:

 (a) The parties opposing the stipulation have notice that the stipulation may
be considered by the Commission and an opportunity to be heard on their reasons
for opposing the stipulation;

 (b) The matters contained in the stipulation are supported by a
preponderance of the credible evidence in the case;

 (c) The stipulation is in accordance with applicable law;

 (d) The stipulation results in just and reasonable rates;

 (e) The results of the stipulation are in the public interest, including the
interest of those customers represented by parties opposing the stipulation.


5. Pursuant to the Findings of Fact and Conclusions of Law set forth below, the
Commission finds the Amended and Restated Stipulation, as modified, is a
reasonable basis for resolution of the issues in this case and that adoption of the
Amended and Restated Stipulation, as modified, as the basis of the Commission's
Order in this proceeding is in the public interest.


In addition, Finding of Fact No. 237 stated: "The provisions of the Amended and Restated
Stipulation are reasonable and supported by a preponderance of the credible evidence in this
record and should be adopted." Conclusion of Law No. 28 stated: "The Amended and Restated
Stipulation, as modified per Finding of Fact No. 6, represents a reasonable resolution of the
contested issues in this docket, is supported in the record, is in the public interest, and should
therefore be adopted, as the basis for the Commission's Order in this case."

 Appellants have not shown that use of the stipulation as a partial basis for the final
order is arbitrary, unreasonable, an abuse of discretion, or involves consideration of factors other
than those the legislature has directed the Commission to consider. Under such circumstances,
we conclude that the Commission may generally set just and reasonable rates in an order based,
in part, on a non-unanimous stipulation.

 On a procedural level, OPC asserts that the Commission's rules, specifically Public
Utility Commission Rules of Practice & Procedure § 21.151, 16 Tex. Admin. Code § 21.151
(1990), prohibit it from basing its order on a non-unanimous stipulation. Section 21.151 provides:

After the expiration of the time for filing exceptions and replies thereto, the
examiner's report and proposal for decision will be considered by the commission
and either adopted, modified and adopted, or remanded to the examiner. . . . 


OPC admits the Commission has the power to reject an examiner's recommendation; however,
it claims the Commission may not modify and then adopt a stipulation. OPC argues that the
Commission violated section 21.151 by basing its final order on a modified stipulation over the
examiner's contrary recommendation. The argument is meritless.

 Paragraph six of the Commission's final order expressly adopts findings of fact and
conclusions of law proposed by the parties who signed the stipulation. The Commission accepted
the proposed findings and conclusions rather than those recommended by the examiner only when
there was a conflict between the two. The Commission expressly adopted the "examiner's report"
to the degree it was consistent with the proposed findings and conclusions; it expressly repudiated
the section of the examiner's report concerning EPEC's prudence in investing and remaining
involved in the project. We hold that the Commission was not required to accept or reject the
examiner's report in its entirety. The Commission's authority undoubtedly extends to repudiating
a part of the examiner's report and modifying it by deletion.

 Within its challenge to the Commission's use of the stipulation, OPC claims that
paragraph 4(e) of the Commission's final order "supplants" OPC's authority to represent the
interest of residential and small business consumers in ratemaking cases of this type. Paragraph
4(e) provides: "The results of the stipulation are in the public interest, including the interest of
those customers represented by parties opposing the stipulation." OPC's interpretation of the
order and of its own enabling legislation is incorrect.

 The legislature created OPC to "advocate" the interests of residential and small
commercial consumers. PURA § 15A (a). However, the Commission must set just and
reasonable rates in ratemaking cases. PURA § 38. In addition, only the Commission has the
authority to determine whether a sale of utility assets is in the public interest. See PURA § 63. 
Authority to advocate a position on behalf of small businesses and residential consumers is not
equivalent to authority to decide what is in the public's best interest. The only authority OPC
possesses is the former. OPC's contention is overruled.

 One challenge to the Commission's use of the non-unanimous stipulation remains. 
Appellants argue that some findings of fact phrased in statutory language lack the required
accompanying concise statements or findings of underlying facts. This argument, addressed to
all the findings accompanying the final order, is too general to preserve error. To the extent that
appellants assert generally that necessary findings of underlying fact are missing, they have
waived their complaint by failing to demonstrate any error prejudicing their substantial rights. 
See Administrative Procedure and Texas Register Act (hereinafter "APTRA"), Tex. Rev. Civ.
Stat. Ann. art. 6253a-13, § 19(e) (Supp. 1992).

 The order addresses numerous issues, and appellants have made several specific
substantial-evidence and finding-of-fact challenges. We will discuss appellants' specific (and
consequently preserved) challenges while disposing of their remaining points of error.


"DECISIONAL" IMPRUDENCE


 The Commission concluded that due to imprudent decisions, $32 million of EPEC's
costs should not be included in rate base. The City's third point of error and OPC's second point
contend that the disallowance is unsupported by substantial record evidence, arguing that the
amount disallowed should have been greater. (3) OPC also charges that the Commission acted
arbitrarily and abused its discretion in selecting the $32 million figure and that it made insufficient
findings of underlying facts.

 Based on its anticipated load demand, EPEC first decided to participate in the
nuclear power project at a 15.8% level. Confident that its decision was a prudent one, EPEC has
continued to participate at the same level. When appellants challenged the prudence of EPEC's
decisions, the City, EPEC, and the Commission staff each offered expert testimony on whether
EPEC had acted prudently in deciding to participate in the project and in continuing to participate
at the 15.8% level. The Commission concluded EPEC had not been entirely prudent in making
decisions about its level of participation in the project. 

 The issues we must resolve are: (1) whether substantial evidence supports the
findings underlying the Commission's disallowance of the precise $32 million figure, and (2)
whether the Commission made the necessary findings of fact to allow this Court to conduct a
meaningful review of imprudently incurred costs.


A. Substantial Evidence and Abuse of Discretion.

 In conducting a substantial-evidence review, we must determine whether the
evidence as a whole is such that reasonable minds could have reached the conclusion the agency
must have reached in order to take the disputed action. Texas State Bd. of Dental Examiners v.
Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080 (1989); Texas Health
Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453 (Tex. 1984). We may
not substitute our judgment for that of the agency and may consider only the record on which the
agency based its decision. Sizemore, 759 S.W.2d at 116. The appealing party bears the burden
of showing a lack of substantial evidence. Charter Medical, 665 S.W.2d at 453. It cannot meet
this burden merely by showing that the evidence preponderates against the agency decision. Id.
at 452. If substantial evidence would support either affirmative or negative findings, we must
uphold the agency's order, resolving any conflict in favor of the agency's decision. Auto Convoy
Co. v. Railroad Comm'n, 507 S.W.2d 718, 722 (Tex. 1974); Warner v. City of Lufkin, 582
S.W.2d 165, 167 (Tex. Civ. App. 1979, writ ref'd n.r.e.). 

 Appellants' position is that only the City's witness, Ben Johnson, provided a
method by which the Commission could quantify the amount of imprudently incurred costs. 
Johnson offered the opinion that EPEC had made several imprudent decisions and that, as a result,
the Commission should disallow 50% of its costs. The City contends that because no other
witness suggested a quantification method, the Commission, upon a finding of some decisional
imprudence, should have adopted Johnson's quantification method and, necessarily, his result. 
We do not agree. 

 The Commission is empowered to hold hearings, receive evidence, make decisions,
issue orders, and find facts. PURA § 16. In addition, the Commission impliedly possesses those
powers necessary and convenient to making findings and decisions. PURA § 16(a). PURA does
not expressly confer on the Commission power to judge witnesses' credibility; however, the
requirement that the Commission make decisions, findings of fact, and conclusions of law implies
the necessary corollary power to judge credibility and to accept or reject a witness's testimony in
whole or in part. Gerst v. Guardian Sav. & Loan Ass'n, 434 S.W.2d 113, 116 (Tex. 1968);
Texas State Bd. of Dental Examiners v. Silagi, 766 S.W.2d 280, 283 (Tex. App. 1989, writ
denied).

 EPEC maintains that, based on information available at the time it made its
decisions, its continued participation in the project would enable it to supply ratepayers with
needed electricity at the lowest possible cost. Consequently, EPEC contends that all its costs
should be included in rate base. The City, on the other hand, argues that available data would
have informed a prudent utility manager that involvement in a nuclear project would be unduly
burdensome to ratepayers. Consequently, Johnson recommended that the Commission disallow
half of EPEC's costs. However, the evidence encompassed more than Johnson's
recommendations.

 All the witnesses who offered their opinions about EPEC's decisional prudence
recognized the complexity of a decision to construct or purchase new generating capacity. A
utility must weigh many competing concerns before undertaking an expansion project. EPEC,
as a part of its decision to participate in the Arizona Nuclear Power Project, considered the
following factors, among others: (1) the feasibility of obtaining financing; (2) the effect of long-term financing on EPEC's financial integrity; (3) the potential impact on ratepayers of increasing
system capacity by a significant percentage; (4) predicted expenses, revenues, and load demands
for the relevant time periods; (5) EPEC's degree of financial flexibility; and (6) the availability
of alternative sources for the additional capacity that forecasts had shown would be necessary. 
The effects these factors have on total project costs are not susceptible of ready quantification. Requiring the Commission to adopt or reject witnesses' testimony in toto, especially
when the testimony concerns a multi-faceted issue such as this one, would hobble the
Commission's ability to assess each witness and render its decision based solely on the testimony
it found credible. Having deduced that the Commission may properly accept less than all of a
witness's testimony, we conclude the Commission committed no error in disallowing a lesser
percentage of costs than Johnson recommended. The Commission could properly identify the
factors which credible evidence showed EPEC should have considered when making its decisions. 
Likewise, the Commission could also decide that prudence would not have required EPEC to
consider other factors because the evidence to the contrary was not credible. 

 The record contains substantial evidence to support a disallowance figure of zero
for decisional imprudence; the Commission would, therefore, have been acting within its
discretion had it agreed that EPEC was entirely prudent in its management and planning. The
substantial evidence would also have supported a Commission finding that 50% of EPEC's costs
should have been disallowed. (4) Appellants assert that the stipulation is the only possible evidence
of the exact $32 million disallowance. Because the appellants do not admit that the stipulation has
any evidentiary weight, they contend there is no evidence to support the $32 million figure. We
disagree.

 Because it is a statement contrary to EPEC's pecuniary interest, the concession has
some evidentiary weight. A declaration contrary to a party's position on a disputed issue is akin
to a quasi-admission. While not binding on the declarant, as a judicial admission would be, such
a concession constitutes some evidence. Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,
606 S.W.2d 692, 694 (Tex. 1980); Texas Distillers, Inc. v. Howell, 409 S.W.2d 888, 890 (Tex.
Civ. App. 1966, writ ref'd n.r.e.). It is for the trier of fact to determine the weight to be assigned
to a quasi-admission. Mendoza, 606 S.W.2d at 694. 

 EPEC's position has always been that it acted prudently in deciding to participate
in the project at the 15.8% level. Nevertheless, EPEC conceded through the stipulation that, if
its decision had been imprudent, the resulting costs that should be disallowed totaled $32 million. 
Such a statement is clearly contrary to EPEC's position. Therefore, the Commission could
properly consider and weigh the stipulation in quantifying the imprudently incurred costs.

 The range of figures supported by the testimony of expert witnesses, the complexity
of the issues the Commission had to review to determine whether EPEC made prudent decisions,
the difficulty of assigning a value to the effects of any component on project costs, and EPEC's
admission against interest all combine to compel our conclusion that substantial record evidence
supports the $32 million disallowance. We overrule the substantial-evidence challenge to the
disallowance for decisional imprudence.

 In addition, because OPC's contention that the Commission abused its discretion
rests on the premise that the stipulation has no evidentiary weight, and because we have concluded
to the contrary, we overrule this contention as well. 

B. Findings of Fact.

 As its final challenge within this point, OPC asserts that "[t]he Commission's
findings are insufficient to comply with APTRA." However, instead of arguing that specific
findings of underlying fact are insufficient, OPC complains that the Commission failed to provide
"explicit statements of underlying facts to support its findings as required by Tex. Rev. Civ. Stat.
Ann. art. 6252-13a, § 16(e) (APTRA)." (5)
 

 Section 16(b) of APTRA provides, in part, that "[f]indings of fact, if set forth in
statutory language, must be accompanied by a concise and explicit statement of the underlying
facts supporting the findings." (Emphasis added.) The Texas Supreme Court has concluded that
an agency's findings of fact need the additional support of findings of underlying facts only when
the ultimate findings are in terms taken directly from the enabling legislation or when they
"represent the criteria that the legislature has directed the agency to consider in performing its
function." Charter Medical, 665 S.W.2d at 451.

 The "statutory language" to which APTRA § 16(b) refers is the language in the
statute that confers authority on the agency to take the complained-of action. Id. In PURA, the
legislature authorized the Commission to make orders setting rates. PURA § 37. A number of
PURA's sections also detail the criteria the Commission is to consider in setting rates. See PURA
§§ 38, 39, 41, and 43. Therefore, only when the Commission's findings are stated in PURA's
express terms, or when they represent criteria the legislature has directed the Commission to
consider, must the Commission also make findings of underlying fact.

 OPC does not direct us to a particular finding that requires, but is not accompanied
by, findings of underlying fact. However, we conclude from its argument that Findings 101
through 103 are the subjects of its complaint, because those findings address the prudence and
disallowance issues. Although PURA does not expressly require the Commission to make a
finding of prudence before including costs in rate base, once the Commission finds a major project
to have been imprudently planned or managed, it should generally disallow project costs to the
extent of the imprudence. See PURA § 41(a); supra note 3. 

 Finding of Fact 101 is phrased in statutory terms; the Commission therein decided
that EPEC was "not entirely prudent in its planning and management" of the project. The
phrasing of that finding in statutory terms required the Commission to make findings of
underlying fact showing the basis for the Commission's determination of imprudence and
supplying the amount of the disallowance. Findings 102 and 103 accomplish these goals. 

 Neither Finding 102 or 103 is phrased in statutory terms. Finding 103 states that
"[q]uantification of the effects of imprudence requires the exercise of judgment based upon the
evidence. In light of the evidence relating to prudence and the difficulties in quantification, the
quantification of decisional imprudence at $32 million for Units 1 and 2 is reasonable and
appropriate." Finding 102 indicates the Commission concluded that imprudence existed only with
respect to "the Company's continuing evaluation of the level of its participation in the Palo Verde
Project." (Emphasis added.) Taken together, these findings adequately supply the required
concise statement of underlying facts supporting Finding 101.

 OPC contends that, in order to be sufficient, the Commission's findings of
underlying fact must identify "the processes and acts found to be imprudent, the nexus between
those acts and the disallowance amount, [and] the evidentiary support for the disallowance figure." 
OPC fails to point either to statutory provisions or case law mandating that the Commission make
such findings. Not having discovered any such authority ourselves, we conclude that such
findings are not required.

 We overrule the City's third point of error and OPC's second point of error.




DEFERRALS


 EPEC requested that its rate base be increased by the amount of carrying costs and
operating and maintenance costs it incurred during "regulatory lag." (6) The utility had "deferred"
these types of costs for Units 1 and 2, aggregating each type of cost for each unit into a separate
capital account. (7) EPEC obtained the Commission's prior permission to defer Unit 1 costs. The
Commission reserved the right, however, to refuse subsequently to include the deferred costs in
rate base to the extent they were unreasonable, related to plant not used and useful, or were spent
or incurred imprudently. Although EPEC did not obtain prior permission to defer its post-in-service costs for Unit 2, it nevertheless deferred them, apparently assuming that obtaining prior
approval a second time was unnecessary. After the rate-increase proceeding was completed, the
Commission included the deferred costs for both units in rate base.

 In this appeal, the City and OPC contend the Commission erred, first, in entering
an order permitting EPEC to defer Unit 1 costs and, second, in subsequently including the
"deferred-costs assets" for both units in rate base. (8) OPC and the City lodge several arguments
against the deferred accounting procedure used here, including that the practice constitutes
impermissible retroactive ratemaking and that it violates the "original-cost" standard contained in
PURA § 41(a). (9) Thus, they assert that the Commission exceeded its authority by including the
deferred post-in-service costs in rate base.

 A reviewing court's role in construing a statute is to "seek out the legislative intent
from a general view of the enactment as a whole, and, once the intent has been ascertained, to
construe the statute so as to give effect to the purpose of the Legislature." Hightower v. State
Comm'r of Educ., 778 S.W.2d 595, 597 (Tex. App. 1989, no writ); see also Medeiros v.
Insurance Co. of N. Am., 781 S.W.2d 404, 406 (Tex. App. 1989, no writ); Sexton v. Mount
Olivet Cemetery Ass'n, 720 S.W.2d 129, 137 (Tex. App. 1986, writ ref'd n.r.e.).

 As a general rule, an administrative agency is a creation of the legislature and, as
such, has only those powers expressly conferred and those necessary to the accomplishment of
its duties. State v. Jackson, 376 S.W.2d 341, 344 (Tex. 1964); Sexton, 720 S.W.2d at 137;
Railroad Comm'n v. Atchison, T. & S.F. R.R., 609 S.W.2d 641, 643 (Tex. Civ. App. 1980, writ
ref'd n.r.e.). The present case is governed by PURA, which expressly grants to the Commission
"the general power to regulate and supervise the business of every public utility within its
jurisdiction and to do all things, whether specifically designated in this Act or implied herein,
necessary and convenient to the exercise of this power and jurisdiction." PURA § 16(a). A
reviewing court may determine, as a matter of law, the scope of an agency's statutory authority. 
See Gage v. Railroad Comm'n, 582 S.W.2d 410, 412 (Tex. 1979). 

 The power of an agency to take such actions as may be "necessary" to perform an
express duty is not without limits. This Court has previously held that


 [t]he agency may not, however, on a theory of necessary implication from
a specific power, function, or duty expressly delegated, erect and exercise what
really amounts to a new and additional power or one that contradicts the statute,
no matter that the new power is viewed as being expedient for administrative
purposes.


Sexton, 720 S.W.2d at 137-38 (emphasis added). Thus, if there is no specific express authority
for a challenged action, and if the action is inconsistent with a statutory provision or ascertainable
legislative intent, we must conclude that, by performing the act, the agency has exceeded its grant
of statutory authority.

 PURA requires the Commission to set rates at a level that will permit each utility
"a reasonable opportunity to earn a reasonable return on its invested capital used and useful in
rendering service to the public over and above its reasonable operating expenses." PURA § 39(a). 
This provision imposes many complex tasks on the Commission: What are the utility's reasonable
operating expenses? What portion of the utility's expenditures constitute capital investment? 
What portion of the utility's invested capital is used and useful in rendering service? How should
the value of the utility's used-and-useful invested capital be calculated? What is a reasonable
return on the utility's used-and-useful invested capital?

 Historically, one of the most vexing questions for regulatory authorities has been
how to calculate the value of a utility's invested capital. See Charles F. Phillips, The Regulation
of Public Utilities 305-29 (2nd ed. 1988) (hereinafter cited as "Phillips"). In the landmark case
of Smyth v. Ames, 169 U.S. 466 (1898), the United States Supreme Court established the legal
basis of the so-called "fair value" doctrine:


[T]he basis of all calculations as to the reasonableness of rates to be charged by a
corporation . . . must be the fair value of the property being used by it for the
convenience of the public. And in order to ascertain that value, the original cost
of construction, the amount expended in permanent improvements, the amount and
market value of its bonds and stock, the present as compared with the original cost
of construction, the probable earning capacity of the property under particular rates
prescribed by statute, and the sum required to meet operating expenses, are all
matters for consideration, and are to be given such weight as may be just and right
in each case. We do not say that there may not be other matters to be regarded in
estimating the value of the property. What the company is entitled to ask is a fair
return upon the value of that which it employs for the public convenience.


Id. at 546-47.

 Smyth v. Ames commanded that both the original cost of construction, on the one
hand, and the current reproduction or replacement cost, on the other hand, must be "considered"
in setting rates. As debate raged as to which of the two cost measures should receive the greater
weight or emphasis, the Smyth fair-return doctrine received increasing criticism over the years. 
Finally, Smyth was abandoned by the Supreme Court in Federal Power Comm'n v. Hope Natural
Gas Co., 320 U.S. 591 (1944). The Court in Hope held that regulatory commissions are not
bound by any particular formula in determining rates, as long as the rates established "enable the
company to operate successfully, to maintain its financial integrity, to attract capital, and to
compensate its investors for the risks assumed." 320 U.S. at 605.

 The Texas experience roughly paralleled that of the federal system. In Railroad
Commission v. Houston Natural Gas Corporation, 289 S.W.2d 559 (Tex. 1956), after a thorough
historical review, the Texas Supreme Court held that pre-PURA statutes mandated a fair-value
method of valuation, which the court defined as "a reasonable balance between original cost less
depreciation and replacement cost new less an adjustment for present age and condition." Id. at
572. As originally adopted in 1975, PURA incorporated this fair-value definition. (10) In 1983,
however, the legislature amended PURA to make Texas a pure "original-cost" state. Section 41(a)
of PURA now provides:


 Sec. 41. The components of invested capital . . . shall be determined
according to the following rules:


 (a) Invested Capital. Utility rates shall be based upon the original cost of
property used by and useful to the public utility in providing service including
construction work in progress at cost as recorded on the books of the utility. The
inclusion of construction work in progress is an exceptional form of rate relief to
be granted only upon the demonstration by the utility that such inclusion is
necessary to the financial integrity of the utility. Construction work in progress
shall not be included in the rate base for major projects under construction to the
extent that such projects have been inefficiently or imprudently planned or
managed. Original cost shall be the actual money cost, or the actual money value
of any consideration paid other than money, of the property at the time it shall
have been dedicated to public use, whether by the utility which is the present owner
or by a predecessor, less depreciation.


PURA § 41(a) (emphasis added).

 In addressing the arguments made by the City and OPC in the present case, we
deem it convenient to discuss separately the two different types of costs for which the Commission
allowed deferred-accounting treatment: (1) carrying costs, and (2) operating and maintenance
costs.

A. Carrying Costs (11)

 As a general rule, the only assets that may be included in a utility's rate base (so
that the utility earns a return on the value of such assets) are those found to be "used and useful"
in providing service to the utility's customers. As quoted above, for example, section 41(a) of
PURA specifically states that rates must be based on "the original cost of property used by and
useful to the public utility in providing service." When a new plant is built, the utility must invest
large amounts of capital during construction. Until the plant is completed, however, it is usually
not considered a used and useful asset. Accordingly, a rigid application of the used-and-useful
rule could prohibit the utility from earning a return on this invested capital until the new plant is
completed and its cost is included in rate base by the regulatory authority. Thus, under such a
rigid application, equity capital that had been or could have been earning a return for the utility
would, when devoted to construction of the new plant, be unable to earn a return until the new
plant was completed and its cost included in rate base; further, any interest actually paid on
borrowed funds would not earn a return, even though the payment of such interest might have
required the investment of additional capital.

 It has been widely if not universally conceded that utilities should, in fairness and
occasionally out of economic necessity, be compensated for these carrying costs, especially for
major capital construction projects. Two methods have been developed to compensate utilities
for such costs. The first method


capitalizes the carrying charges incurred during the construction period as
allowance for funds used during construction (AFUDC). AFUDC is recorded part
as current income, part as an offset to interest expenses, but no cash payments are
made by ratepayers during construction. The payments from ratepayers to recover
the carrying charges begin when the completed plant goes on stream. The entire
cost of the plant (including AFUDC) is added to rate base, and it earns a rate of
return on investment and is depreciated over the life of that plant.


James Bonbright, et al., Principles of Public Utility Rates 246 (2nd ed. 1988) (hereinafter cited
as "Bonbright"). The second method, as the Bonbright treatise explains it, 


is to include construction work in progress (CWIP) in the rate base. (CWIP
includes accrued AFUDC on investment not in rate base.) The regulatee recovers
its carrying charges currently from ratepayers through the return component of its
rates, rather than adding them to the cost of construction for recovery when the
plant is in service. The return on CWIP is recorded as income on a current basis
(like AFUDC), and actual cash payments are made by the ratepayers currently
(unlike AFUDC).


Id. Section 41(a) of PURA expressly permits the inclusion of CWIP in rate base where the utility
demonstrates that "such inclusion is necessary to the financial integrity of the utility," and CWIP
may be included only to the extent that the project has not been "inefficiently or imprudently
planned or managed." PURA § 41(a).

 In the present case, CWIP was not requested; rather, EPEC accrued AFUDC in
a capital account while the plant was under construction. When the new plant began commercial
operation, FERC accounting rules required EPEC to cease accruing AFUDC in a capital account;
any such costs that continue after commercial operation begins must thereafter be recorded as
expenses. Except for deductions for imprudence, the "original cost" of the plant, including
AFUDC, was included by the Commission in EPEC's rate base. In addition, however, the
Commission allowed EPEC to defer, and later included in rate base, the carrying costs that EPEC
incurred between the date of commercial operation and the effective date of the new rates that
included in rate base the "original cost" of the Palo Verde plant. These carrying costs appear to
be simply a continuation of AFUDC under a different name. OPC contends that the
Commission's action violated the provision in section 41(a) permitting only the cost of the new
plant "at the time it shall have been dedicated to public use" to be included in rate base. We
agree.

 The legislature has made it clear in section 41(a) that the value of new plant is, for
rate-base purposes, to be measured by its original cost at the time the plant is dedicated to public
use. As stated above, it has been generally recognized that carrying costs associated with the
construction of a new plant are essentially part of the "original cost" of constructing the plant, and
the utility should be compensated for them by including at least part of those costs in rate base. 
Nonetheless, the legislature apparently chose to simplify the calculation of a plant's original cost
by placing a "cut-off date" on construction and acquisition costs: such costs must be calculated
as of the time the physical asset being constructed or acquired is placed in public service. (12)

 As stated earlier, the post-in-service carrying costs that were allowed to be
"deferred" and which were included in rate base in the present case are indistinguishable from the
AFUDC that was properly accrued and capitalized before commercial operation began. 
Accordingly, any procedure that permits such costs to be included in rate base would effectively
allow the inclusion in rate base of a construction cost of the plant that was incurred after the
plant's dedication to public use, thereby violating the mandate of section 41(a) that the original
cost of new plant be calculated as of the date the plant is placed in public service. In effect, such
a procedure would, by an accounting device, permit the Commission to let in through the back
door what the legislature has expressly prohibited coming in the front door.

 Even without the unique wording of section 41(a), the Washington Utilities and
Transportation Commission reached the same conclusion when faced with a request to extend the
period of capitalization of AFUDC from the in-service date of a new plant to the date when new
rates went into effect:


[A]ccrual of AFUDC after the in-service date of a utility plant would result in a
utility plant with a value exceeding its "original" cost. The original cost concept
requires that the value of utility plant be determined at the time it is first placed in
service to the public. To grant this petition would establish a dangerous and
unwarranted precedent leading to further requests to disregard the original cost
concept.


In re Puget Sound Power & Light Co., 62 PUR4th 436, 440 (Wash. Util. & Transp. Comm'n
1984). Whether or not one agrees that the original-cost method of valuation requires, as a general
proposition, that the value of a utility plant must be determined at the time it is first placed in
service to the public, the language of section 41(a) clearly mandates that approach. Accordingly,
the Commission contravened section 41(a) when it allowed post-in-service carrying costs to be
included in EPEC's rate base.

 EPEC and the Commission present several arguments against such a construction
of section 41(a). First, they argue that the phrase "at the time it shall have been dedicated to
public use" does not mean the time the plant itself is placed in service. They assert, instead, that
the phrase refers to the money spent to construct the plant, and that such money is dedicated to
public use at the time it is spent. We cannot agree with this interpretation of section 41(a). For
example, section 41(a) states that "original cost" is "the actual money cost . . . of the property at
the time it shall have been dedicated to public use." Thus, the reference to "property" in section
41(a) is obviously to property being acquired or constructed in exchange for the payment of
money, not to the funds themselves used to pay for its acquisition or construction. Just as clearly,
the term "it" in the phrase "at the time it shall have been dedicated to public use" refers back to
the "property" being acquired or constructed. Thus, in the case of new plant, section 41(a)
requires that the plant's original cost be determined as of the time the new plant is placed in
service.

 EPEC and the Commission next argue that "dedicated to public use" does not refer
to the time a plant begins commercial operation. We disagree. Having determined that the "cut-off date" contained in section 41(a) refers to the property being acquired or constructed, and not
to the money used to pay for its acquisition or construction, the question becomes: When is a new
plant dedicated to public use? We conclude that new plant is dedicated to public use when it is
first placed in public service. First, the plain meaning of the statutory provision supports the
proposition that a plant has not been "dedicated to public use" until it has been placed in public
service, and a plant is placed in public service when it begins operating commercially. Second,
under FERC rules and Commission practice, a utility must cease accruing AFUDC when a new
plant begins commercial operation. Simple logic dictates that the most appropriate time to
determine the original cost of a capital asset is when existing accounting rules require that a
significant, ongoing cost of that asset cease being capitalized and start being expensed.

 In this connection, EPEC and the Commission also argue that section 41(a) does
not contain any temporal limitation (i.e., "cut-off date") on the determination of the original cost
of capital assets. They stress that section 41(a) provides that original cost is the actual money cost
of property "at the time it shall have been dedicated to public use, whether by the utility which is
the present owner or by a predecessor." They contend that the emphasized clause above shows
that the purpose of section 41(a) is simply to prevent utilities from selling or transferring a plant
to another utility and having the purchasing utility use its purchase price as the original cost of
the plant. Thus, they argue, the last sentence of section 41(a) merely requires that original cost
be the cost to whichever utility first placed the plant in public service, not that original cost must
necessarily be determined at the specific time that the plant was placed in service. We disagree. 
The language of section 41(a) could hardly be clearer in this regard: "Original cost shall be the
actual money cost . . . of the property at the time it shall have been dedicated to public use . . .
." The clause that follows, "whether by the utility which is the present owner or by a
predecessor," is simply one of clarification, emphasizing that the time of dedication to public use
is the critical date, irrespective of whether that dedication was made by the current owner or a
predecessor.

 Ignoring the statute's plain language, EPEC cites Office of Consumers' Counsel v.
Public Utilities Commission, 480 N.E.2d 1105 (Ohio 1985), in which the Ohio Supreme Court
construed the relevant Ohio statute to mean that original cost would be the cost "to the person that
first dedicated the property to the public use"; the court went on to hold that the statute
"establishes which entities' costs are to be utilized in establishing a rate base. [It] does not affect
the timing of property valuation." Id. at 1107. A comparison of the Ohio statute with the Texas
statute, however, shows why the Texas statute cannot rationally be given the same construction. 
The Ohio statute provided: "Such original cost of property . . . shall be the cost, as determined
to be reasonable by the commission, to the person that first dedicated the property to the public
use . . . ." Ohio Rev. Code Ann. § 4909.05(E) (emphasis added). The Texas statute provides: 
"Original cost shall be the actual money cost . . . of the property at the time is shall have been
dedicated to public use, whether by the utility which is the present owner or by a predecessor, less
depreciation." PURA § 41(a). The two statutes could not be more different in their focus and
meaning. The Ohio statute focuses on "who"; the Texas statute focuses on "when." Accordingly,
the Office of Consumers' Counsel case is inapposite.

 EPEC and the Commission next argue that our construction of section 41(a) will
prevent the inclusion in rate base of recognized elements of invested capital, such as working
capital, "accumulated deferred federal income tax," and rate case expenses, none of which have
a "commercial operation" date or an "in-service" date. We disagree that our holding will have
such an effect. As stated above, the purpose of section 41(a) was to establish a method of valuing
tangible property acquired or constructed by the utility. Although the term "property" can, in an
appropriate context, certainly have a meaning broader than just tangibles, the history of the
original-cost/replacement-cost debate as to the proper method of valuing a utility's invested capital
indicates that the crux of the dispute has related primarily, if not exclusively, to plant-in-service. 
Indeed, the supreme court in the Alvin Case held that "the Texas statutes require a physical
property valuation rate base." Houston Natural Gas, 289 S.W.2d at 564 (emphasis added).

 We recognize that a utility's invested capitaland therefore its rate basecan include
more than plant-in-service. For example, one noted commentator identifies the following four
elements of a utility's rate base: (1) "tangibles, which includes `used and useful' land, buildings,
and equipment (plant)"; (2) "other elements of value, [which] includes working capital, property
held for future use, and intangibles"; (3) "customer contributions and tax deferrals, [which are]
frequently deducted from the rate base, since those components do not represent investor-supplied
capital"; and (4) "construction work in progress." Phillips, supra at 302. The Bonbright treatise
also identifies four elements of rate base, although it arranges the categories somewhat differently: 
"(1) net plant in service; (2) property held for future use; (3) working capital; and (4) construction
work in progress (CWIP)no AFUDC." Bonbright, supra at 237.

 Although "invested capital" can include more than tangible assets, it is simply not
feasible to apply the original-cost formula contained in section 41(a) to certain types of assets,
e.g., intangibles and working capital. Such assets have no money "cost" by which they are
acquired or constructed; indeed, in some instances they more closely resemble the payment of
money than a tangible asset for which money is paid. Nonetheless, we do not believe the
legislature intended for section 41(a) to limit a utility's rate base to the original cost of tangible
assets, and we do not so hold. We hold only that the original-cost formula ("the actual money
cost . . . of the property at the time it shall have been dedicated to public use") states a mandatory
method for the valuation of tangible assets, i.e., plant-in-service. This holding neither addresses
nor affects the issue of whetherand to what extentother types of assets may be included in rate
base.

 EPEC and the Commission next argue that sections 2, 16, 27, and 39 of PURA
grant broad enough powers to the Commission to allow it to use "deferred accounting"
procedures. Without discussing those statutory provisions in detail, we note our general
agreement that they grant broad power and discretion to the Commission. However, they do not
expressly authorize inclusion of post-in-service carrying costs in rate base, and we cannot construe
them to impliedly permit an action that is contrary to or inconsistent with another section of
PURA. Sexton, 720 S.W.2d at 137-38. And as we have held, allowing post-in-service carrying
costs to be included in rate base is inconsistent with section 41(a). (13)

 We conclude, therefore, that the Commission exceeded its authority when it
included in EPEC's rate base the carrying costs incurred by EPEC after the Palo Verde plant
began commercial operation.

B. Operating and Maintenance Costs

1. PURA § 41(a)

 The foregoing discussion makes it clear that we consider the purpose of PURA
§ 41(a) to be the establishment of a method of determining the value of tangible capital assets that
a utility has acquired or constructed. Section 41(a) prohibits post-in-service carrying costs from
being included in rate base because carrying costs constitute part of the actual money cost of
acquiring or constructing new plant. Operating and maintenance (O&M) costs, on the other hand,
are not part of the cost of acquiring or constructing new plant; rather, they are expenses associated
with maintaining the plant after it is already in service. To illustrate the distinction, if the Palo
Verde plant had been completely shut down and abandoned the day after it became operational,
EPEC's carrying costs would have continued unabated until all funds borrowed for its
construction were repaid; the O&M costs, however, would have ceased. Because post-in-service
O&M costs are not part of the "actual money cost" of acquiring or constructing the plant, the
original-cost formula contained in section 41(a) simply has no application to such expenditures. 
Accordingly, whatever other objections may be made to the inclusion in rate base of post-in-service O&M costs, such inclusion is not inconsistent with PURA § 41(a).



2. Retroactive Ratemaking

 Initially, we note that EPEC applied for and received from the Commission
permission to defer post-in-service O&M costs on Palo Verde Unit 1 before that unit became
commercially operational. Accordingly, we question whether the inclusion of Unit 1 O&M costs
has any retrospective effect at all. Indeed, the City does not even lodge a retroactive-ratemaking
complaint about the inclusion in rate base of O&M costs as to Unit 1. However, because we must
address whether the inclusion in rate base of O&M costs for Unit 2 constitutes improper
retroactive ratemaking, we will assume without deciding that the Commission's inclusion of Unit
1 O&M costs in rate base did have a retrospective effect.

 As stated previously, sections 2, 16, 27, and 39 of PURA expressly grant broad
powers to the Commission. We believe those provisions give the Commission discretionary
authority to allow deferral and capitalization of post-in-service O&M costs, and to permit the
Commission to include such costs in rate base, unless such a procedure is inconsistent with other
state law. Thus, to determine the validity of the Commission's action in the present case, we must
determine whether the deferral, capitalization, and inclusion in rate base of such costs is
inconsistent with a statutory or constitutional prohibition of retroactive ratemaking. See Texas
Ass'n of Long Distance Tel. Cos. (TEXALTEL) v. PUC, 798 S.W.2d 875, 881-82 (Tex. App.
1990, writ denied); Southwestern Bell Tel. Co. v. PUC, 615 S.W.2d 947, 953 (Tex. Civ. App.),
writ ref'd n.r.e., 622 S.W.2d 82 (Tex. 1981). 

 a. Statutory prohibitions.

 In order to satisfy the first prong of the retroactivity test, the action allegedly
having retrospective effect must not contravene any statutory prohibition. As stated above, we
have concluded that the deferral, capitalization, and later inclusion in rate base of post-in-service
O&M costs is not contrary to PURA § 41(a).

 Appellants also contend, however, that inclusion of such O&M costs is inconsistent
with PURA § 43(f). Section 43(f) provides that if, after hearing, the Commission finds the
existing rates to be unreasonable or in violation of law, it shall fix new rates "by order," which
rates are "thereafter to be observed until changed." Although many jurisdictions have construed
the term "thereafter" to give the regulatory authority power to prescribe rates prospectively only,
the Texas Supreme Court stated in one case that the term in section 43(f) gives Texas agencies
"discretion" in setting the effective date of new rates. See Railroad Comm'n v. Lone Star Gas
Co., 656 S.W.2d 421, 425-26 (Tex. 1983). (14) Nonetheless, this Court has held that PURA § 43(f)
prohibits the Commission from making new rates effective at a date earlier than the date of the
order fixing those rates. See PUC v. GTE-SW, No. 3-90-084-CV (Tex. App.Austin, April 1,
1992, n.w.h.); PUC v. General Tel. Co., 777 S.W.2d 827 (Tex. App. 1989, writ dism'd); cf.
TEXALTEL, 798 S.W.2d AT 882-84 (rates may be made effective after order fixing the level of
revenues but before final approval of tariffs).

 In the present case, the effective date of the new rates was not prior to the date of
the order fixing the rates. Therefore, the Commission's action here was not inconsistent with our
holdings in GTE-SW and General Telephone. Appellants argue, however, that the inclusion in
rate base of deferred O&M costs had the effect of implementing the new rates as of the date the
Palo Verde plant became commercially operational, i.e., retroactively. We decline to construe
the term "thereafter" in section 43(f) to have such sweeping effect. We are not willing to say that
the term "thereafter" in PURA § 43(f) constitutes a blanket prohibition of any consideration by
the Commission of a utility's past gains or losses in fixing future rates. Thus, even if the
"thereafter" language in section 43(f) precludes the Commission from making new rates effective
at a date earlier than the date of the order fixing those rates, the Commission's action in the
present casepermitting deferral, capitalization, and inclusion in rate base of EPEC's post-in-service O&M costsis not inconsistent with such a prohibition.

 We conclude, therefore, that the Commission's inclusion in rate base of EPEC's
deferred post-in-service O&M costs is not inconsistent with Texas statutory law.

 b. Constitutional prohibition.

 To withstand the second prong of appellants' retroactive-ratemaking challenge, the
Commission's order must not violate Article I, § 16 of the Texas Constitution, which provides: 
"No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of
contracts shall be made." Courts often recite the rule that ratemaking is a legislative activity, even
when delegated to an administrative body. See, e.g., Houston Natural Gas Corp., 289 S.W.2d
at 563. For that reason, it has often been stated that rates set after an agency hearing generally
must have a prospective effect, just as would laws enacted by the legislature. (15) Id.; see also Tex.
Const. Ann. art. I, § 16 (1984).

 Appellants complain that allowing EPEC to recover post-in-service O&M costs
through deferred accounting would permit EPEC to charge ratepayers an additional amount for
services that they have already received and paid for. In this regard, the following general
observations about retroactive laws are instructive:



[One,] a law is retroactive if it assumes to give effect to a past event, in order to
create a present right or duty. [Two,] . . . a law is retroactive when it assumes to
give to a past event the effect of creating rights and duties ab initio, or as of some
time prior to the retroactive law. . . . 


 . . . Under limitations [one and two], it is true, a law gives to an
event which has already transpired a juristic significance it did not have at the time
it occurred; but it does this only in order that it may thereby regulate future
conduct.



Bryant Smith, Retroactive Laws and Vested Rights, 5 Tex. L. Rev. 231-33 (1927). In addition,
the supreme court has recognized that statutes permitting agencies to consider prior conduct have
retrospective effect. Wright, 464 S.W.2d at 648-49. 

 In the present case, the past event given significance by inclusion in rate base of
the deferred post-in-service O&M costs is the start-up of commercial operation of Units 1 and 2. 
Appellants assert that allowing EPEC to earn a return on such deferred-cost assets gives the start-up of those units the effect, ab initio, of creating a new duty for ratepayers: they are thereafter
required, without Commission approval, to pay higher rates for services received. Thus, recovery
of such O&M costs would, in appellants' view, effect a change in charges after ratepayers have
consumed the service. See, e.g., Lone Star Gas, 656 S.W.2d 421. For purposes of the ensuing
discussion, we will assume without deciding that inclusion in rate base of the post-in-service O&M
costs has a retrospective effect. 

 A retrospective effect alone, however, will not invalidate an agency action. 
Wright, 464 S.W.2d at 648. Notwithstanding a retrospective effect, a rate order may avoid
constitutional infirmity if it does not substantially impair or destroy vested rights, McCain v. Yost,
284 S.W.2d 898, 900 (Tex. 1955); TEXALTEL, 798 S.W.2d at 882, and if it does not change the
substantial rights and obligations of the implied contract between a utility and its ratepayers,
Southwestern Bell, 615 S.W.2d at 956; Amarillo Gas Co. v. City of Amarillo, 208 S.W. 239, 240
(Tex. Civ. App. 1919, no writ). Although courts have often failed to explicate or apply the latter
consideration, we conclude that it is significant in the present case.

 Several courts have concluded that an implied contract exists between a utility and
its ratepayers, creating both the utility's duty to provide a defined service and the ratepayers' duty
to pay a defined rate. See, e.g., Amarillo Gas Co., 208 S.W. at 240; Southwestern Bell, 615
S.W.2d at 956. Under this implied contract, ratepayers have a right to pay a constant rate for
service until, by legislatively approved procedures, the old rate is formally challenged. See
TEXALTEL, 798 S.W.2d at 882. The setting of new rates permissibly adjusts the respective rights
and obligations of the ratepayers and the utility. Only the rights and obligations existing between
rate settings are constitutionally protected against alteration by retroactive ratemaking. 208 S.W.
at 240. Therefore, only if new rates alter the ratepayers' right to pay a set rate for a specified
service will they violate the prohibition of article I, § 16.

 The Amarillo Gas case, involving city ordinances which set consumer gas rates,
typifies true retroactive ratemaking. Among other things, the first ordinance included a provision
which allowed consumers a 10% discount if they paid their bills within ten days. The subsequent
ordinance eliminated the discount and imposed a 10% surcharge on payments made after ten days. 
A dispute arose when the gas company attempted to collect surcharges on bills for gas the
company had supplied before the effective date of the second ordinance. The question on appeal
was whether imposing the surcharge on bills for gas supplied before the effective date "change[d]
the substantial rights and obligations of this contract as to transactions already had under it." 208
S.W. at 240. The court concluded that 



the practical and necessary result of the amendment was to require the consumer
to pay considerably more for his gas than he would have been required to pay
under the old rates. . . . The rates established by the new ordinance did inevitably
make a substantial change in the rights and obligations of the consumer, and we
conclude [that they] cannot be applied to the gas consumed prior to the time the
ordinance took effect.



Id. 

 Unlike Amarillo Gas, the present case involves no attempt to charge ratepayers an
additional sum for service already purchased. Before the effective date of the new rates, EPEC's
ratepayers paid Commission-authorized rates for the service they were obtaining. EPEC invested
in the Palo Verde plant to equip itself to provide additional service to its ratepayers. When the
new plant became commercially operational, the ratepayers began receiving the benefit of the new
service before being charged for it. Therefore, because the Commission had not defined the
substantial rights and obligations of a new implied contract between EPEC and its ratepayers, the
ratepayers had no substantial right to pay a certain rate for service being provided by the Palo
Verde plant. Significantly, the ratepayers also had not paid rates which would allow EPEC a
return on its investment in the plant. Therefore, including in new rates costs incident to the
interim benefit provided by the operation of Palo Verde plant does not change a substantial right
belonging to the ratepayers. Cf. Business & Prof. People for the Pub. Interest v. Illinois
Commerce Comm'n, 563 N.E.2d 877 (Ill. Ct. App. 1990) (deferral of regulatory-lag costs allowed
because costs of new plant had not been taken into account in setting existing rates), rev'd on
other grounds, Nos. 71602, et al. (Ill. Sup. Ct. Dec. 16, 1991).

 Just as allowing inclusion in rate base of the Palo Verde plant's post-in-service
O&M costs does not change the ratepayers' substantial rights, likewise it does not impair or
destroy vested rights. Whether legislation substantially impairs or destroys vested rights
necessitates consideration of whether the retrospective effect: (1) advances or retards the public
interest; (2) effectuates or defeats the bona fide intentions or reasonable expectations of affected
persons; and (3) surprises persons who have long relied on a contrary state of the law. 
Southwestern Bell, 615 S.W.2d at 956-57; see also Wright, 464 S.W.2d at 648.

 The public has an interest in obtaining a reasonable quantity and quality of service. 
The utility should generate the service safely, under the guidance of efficient management, and
make the service obtainable at reasonable rates. See Phillips, supra, at 164. In the present case,
the Commission could reasonably have concluded that including post-in-service O&M costs in rate
base would advance these interests. Further, a ratepayer could not reasonably expect a utility to
spend millions of dollars building a nuclear facility, use the facility to generate electricity, and
then not seek a return on its investment therein. In addition, the fact that the Commission had
previously granted EPEC a certificate of convenience and necessity to participate in the project
thereafter precluded any interested persons from reasonably claiming surprise at finding
themselves obligated to pay the costs of building and operating the new plant.

 All of these important considerations support the conclusion that the Commission
has not substantially impaired or destroyed vested rights by including in rate base EPEC's post-in-service O&M costs. Therefore, because the new rates neither impair vested rights nor change
substantial rights or obligations of implied contract, we conclude that deferral, capitalization, and
inclusion in rate base of such costs does not violate the constitutional prohibition against
retroactive ratemaking.



C. Disallowance for Imprudence.

 OPC also argues in point of error five that the Commission erred by not reducing
the deferred O&M costs in proportion to the imprudence disallowance before including the assets
in rate base. OPC cites no authority that would require the Commission to reduce the "deferred-costs asset" because of imprudence. Instead, it points to the Commission's reservation of the right
to exclude the capitalized costs from rate base contained in the order allowing deferral of Unit 1
costs. Apparently, OPC has construed this reservation as a representation that the costs would
not be included; we do not find any such representation in the order.

D. Substantial Evidence.

 As its final complaint within this point of error, OPC contends that the total figure
assigned by the Commission to the deferred-costs asset is not supported by substantial evidence. 
We do not agree. Our review of the record shows that EPEC provided ample documentation of
the costs it had incurred and deferred after the Palo Verde plant became commercially operational.

 We sustain OPC's and the City's fifth points of error to the extent they complain
of the Commission's deferral, capitalization, and inclusion in rate base of EPEC's post-in-service
carrying costs. We overrule OPC's and the City's fifth points of error to the extent they complain
of the Commission's deferral, capitalization, and inclusion in rate base of EPEC's post-in-service
O&M costs, and in all other respects.


CONSTRUCTIONAL IMPRUDENCE


 By its third point of error, OPC raises three distinct complaints about the
disallowance of $28 million in construction costs as a result of EPEC's imprudent planning or
management of the project's construction. First, OPC asserts that substantial evidence does not
support the Commission's method of quantifying the imprudently incurred costs. Second, OPC
argues that the quantification method used by the Commission results in retroactive ratemaking. 
Finally, OPC complains that "[t]he Commission's finding regarding construction cost impacts is
conclusory and does not indicate the underlying facts relied upon by the PUC." We construe this
contention to be a challenge to the sufficiency of Finding of Fact 100 and an assertion that the
Commission should have made additional findings of underlying facts to support Finding 100.

 EPEC maintains that OPC has waived all of its contentions except that concerning
retroactive ratemaking because it failed to present legal bases for its complaints in its second
motion for rehearing. We do not agree. Although OPC's second motion for rehearing contained
no citations to legal authority for its complaints, the motion did contain statements of OPC's legal
bases for its argument. While motions for rehearing must point out the specific finding challenged
and the legal basis for the challenge, they need not contain citations of authority. Burke v. Central
Educ. Agency, 725 S.W.2d 393, 397 (Tex. App. 1987, writ ref'd n.r.e.). 

A. Retroactive Ratemaking.

 OPC asserts that by disallowing a smaller portion of construction costs than OPC
recommended, "the Commission has retroactively increased the value of the Company's revenue
requirement fixed in prior rate proceedings, and shifted these additional hypothetical costs to
future ratepayers." Essentially, OPC argues that the Commission may not legally adopt a method
recognizing any savings that ratepayers may have realized because of delays in completing
construction. 

 The Commission staff's expert, Morris Jacobs, and the City's expert, Richard B.
Hubbard, agreed that financing costs had increased because of delays. Jacobs also testified,
however, that ratepayers had received an unexpected benefit because of the delay: they had had
the present use of money they would otherwise have had to pay in rates if the construction had
been completed and the costs included in rate base as scheduled. Consequently, according to
Jacobs, the true amount of imprudently incurred costs can be determined only by reducing the
increased financing costs by the amount of the benefit to ratepayers. OPC objects to offsetting
the ratepayers' benefit against the increased financing costs, apparently because the former
accrued before the Commission could set rates including the plant in rate base. Accordingly, OPC
argues that the savings cannot be taken into account without having a retrospective effect on rates.

 We fail to see how recognizing an actual benefit ratepayers derive from delays
would impermissibly increase revenue requirements "fixed in prior rate proceedings." We
conclude that by offsetting such a benefit against increased financing costs in determining the
constructional-imprudence disallowance, the Commission did not change the substantial rights of
the ratepayers or impair or destroy any of their vested rights. See McCain v. Yost, 284 S.W.2d
898, 900 (Tex. 1955); Amarillo Gas Co. v. City of Amarillo, 208 S.W. 239, 240 (Tex. Civ. App.
1919, no writ). Therefore, we reject OPC's retroactive-ratemaking argument.

B. Substantial Evidence.

 Finding of Fact 100 provides: "Staff witness Jacobs presented a credible
quantification of construction management imprudence related to costs of delay in the amount of
$28 million." The gist of OPC's purported substantial-evidence argument is that the Commission
erred in adopting Jacobs's method of quantifying imprudently incurred costs. This is not,
however, a substantial evidence challenge. OPC has not attempted to show that application of
Jacobs's method results in a figure unsupported by substantial evidence; nor does OPC argue that
substantial evidence supports another, but different, figure. We must, therefore, make two
distinct determinations: (1) whether the finding underlying the Commission's $28 million
disallowance of imprudently incurred construction costs is supported by substantial evidence, and
(2) whether Jacobs's method considered all imprudently incurred costs. 

 Turning to the latter first, we recognize that we must not disturb an agency's
exercise of discretion unless it is arbitrary or unreasonable, Murphy, 609 S.W.2d at 297, and that
we must allow the agency some leeway to select the method by which it carries out its own
legislative mandate, Railroad Comm'n v. Humble Oil & Refining Co., 193 S.W.2d 824, 833 (Tex.
Civ. App. 1946, writ ref'd n.r.e.), aff'd, 331 U.S. 791 (1947). Therefore, we will not reverse
the Commission's decision to use Jacobs's method unless OPC can show that the Commission
made its decision arbitrarily and unreasonably.

 Jacobs did not relate any particular imprudent construction management actions to
any specific delays. Jacobs's testimony supports the amount of the Commission's disallowance. 
In addition, other witnesses testified that some construction delays were unavoidable and not the
result of management imprudence. Although the City's witness, Hubbard, supplied testimony
linking specific construction decisions with resulting delays, we conclude that substantial evidence
supports Jacobs's quantification method.

C. Finding of Fact 100.

 OPC challenges the sufficiency of Finding of Fact 100 and alleges that it lacks
necessary findings of underlying facts. Finding 100 is not a finding "set forth in statutory
language" such that it must have a "concise and explicit statement of the underlying facts." See
APTRA § 16(b). Instead, it is itself a finding of underlying fact which supports Finding 99. 
Finding 99 is phrased in statutory language and states that EPEC was imprudent to some degree. 
Finding 100 concisely sets out the underlying facts that (1) based on Jacobs's credible
quantification, (2) $28 million in construction costs would be disallowed. 

 OPC contends the Commission was obligated to explain its adoption of Jacobs's
method rather than Hubbard's. In addition, OPC claims the Commission had a duty to identify
individual instances of construction imprudence.  Appellants have not cited any authority that
would require the Commission to explain why it found a particular witness's testimony credible
or determined a particular figure to have resulted from imprudent construction management. We
consider these arguments to be challenges to the sufficiency of the finding.

 APTRA § 16(b) does not delineate a standard for sufficient findings of underlying
fact. The supreme court articulated the established principles in Charter Medical:



The characteristics of proper findings of fact, as well as their purposes, are well
established. Valid findings of fact must be clear and specific. A mere conclusion
or a recital of evidence is inadequate. The required underlying facts may not be
presumed from findings of a conclusional nature. In general, underlying findings
of fact must be such that the reviewing court can fairly and reasonably say that the
underlying findings support the statutorily required criteria. 


 * * *


Proper underlying (basic) findings of fact should follow the guidelines we
previously have noted: they should be clear, specific, non-conclusory, and
supportive of the ultimate statutory finding. Mere recitals of testimony or
references to or summations of the evidence are improper. Such findings should
be stated as the agency's findings. The findings should relate to material basic
facts and should relate to the ultimate statutory finding that they accompany.



Charter Medical, 665 S.W.2d at 451-52 (citations omitted); see also State Banking Bd. v. Allied
Bank Marble Falls, 748 S.W.2d 447 (Tex. 1988). 

 The supreme court has recently reconsidered the question of sufficiency of
underlying fact findings. See Goeke v. Houston Lighting & Power Co., 797 S.W.2d 12 (Tex.
1990). The court expressed the opinion that, although there is no precise form for an agency's
articulation of underlying facts, certain "guidelines" exist to prevent the types of abuses courts
have found. (16)
 Those specific guidelines are that the findings: (1) must be more than mere recitals
of testimony; (2) should be stated as the agency's findings; and (3) should relate to the ultimate
statutory findings. Id. at 15. We will review appellants' sufficiency complaints under the Goeke
guidelines.

 Finding 100 is not conclusory; it indicates not only the evidence on which the
Commission relied in making Finding 99, but also the Commission's conclusion that the figure
found using the method was credible. The finding obviously supports Finding 99, an ultimate
statutory finding. Therefore, Finding 100 is a sufficient finding of underlying fact. 

 For all of the foregoing reasons, we overrule OPC's third point of error in its
entirety.


THE EXCLUSION OF HUBBARD'S TESTIMONY


 In support of its request that plant construction costs be included in rate base,
EPEC offered evidence of prudent construction management. In response, the City called
Hubbard, who testified that EPEC had managed the construction imprudently and that, as a result,
construction costs had been unreasonably high. EPEC moved to strike sections of Hubbard's
testimony, arguing that his conclusions were inadmissible because they were speculative and not
based on concrete information. The hearing examiner excluded the challenged testimony. The
City complains of the exclusion. EPEC answers that the City waived its complaint by failing to
state a legal basis to support it in the City's second motion for rehearing. 

 An administrative litigant may preserve a complaint only by giving the agency an
opportunity to review the legal ground on which the complaint is based. Sears v. State Bd. of
Dental Examiners, 759 S.W.2d 748, 750 (Tex. App. 1988, no writ); Burke, 725 S.W.2d at 397. 
Our review of the City's motions for rehearing convinces us that EPEC is correct. The City failed
to provide the Commission any basis for finding the testimony admissible. For this reason, we
overrule the City's second point of error. 

 If we had resolved the complaint on its merits, however, we would have found no
reversible error. Hubbard testified at length about the duration of design-problem delays and the
necessity of reworking the designs. We must assume the Commission considered this testimony
and gave it due weight. The examiner excised only minute sections from the thick attachments
to Hubbard's direct testimony. Ample evidence existed from which the Commission could have
found that EPEC had managed the construction imprudently. The City has not shown that the
exclusion prejudiced its substantial rights, and has therefore failed to carry its burden of showing
harmful error.



EXCESS CAPACITY


 The City and OPC, each in its fourth point of error, complain that the Commission
erred in finding that EPEC had no system excess capacity. Both appellants contend that Finding
of Fact 107, in which the Commission concludes that no present excess capacity exists, is
unsupported by substantial evidence in the record. In its argument, the City specifically
challenges the action of the Commission in: (1) including in the load determination the amount
of power EPEC has contracted to sell to the Texas-New Mexico Power Company (TNP); (2)
allowing EPEC to reduce estimated system capacity by retiring three gas-fired units earlier than
it had originally planned; (3) rescheduling maintenance because of the alteration in system
components; and (4) calculating the reserve requirement. 

 OPC joins in the last of these four specific complaints. In addition, OPC complains
that Findings of Fact 111 through 113 do not explicitly state the facts the Commission relied on
and the reasoning it used in disregarding the Examiner's recommendations. OPC also asserts the
Commission erred by not making a conclusion of law clarifying the relation, if any, between the
"used and useful" standard of PURA § 39(a) and the excess capacity concept. Finally, OPC
complains that the Commission "abrogated OPC's right to represent the interests of residential and
small commercial customers on excess capacity issues in future rate cases of El Paso Electric
Company." 

 EPEC's application to increase rates sought only the inclusion in rate base of costs
related to Units 1 and 2. At the time the Commission heard evidence on the application, Unit 3
was not complete and had not begun commercial operation. It would have been improper for the
Commission to have determined, at that time, whether excess capacity would exist on EPEC's
system once Unit 3 became operational. The Unit 3 issues, including excess capacity, are not yet
ripe for determination. Consequently, to the extent the City seeks resolution of Unit 3's used-and-useful status, we overrule its point of error for lack of ripeness.

A. Substantial Evidence.

 Appellants complain that the Commission erred in disregarding the examiner's
recommendations for treatment of four disputed issues. The most heated debate arose when the
Commission selected the "largest single hazard plus 5%" method for determining reserve
requirements. The examiner recommended that the Commission use the "20% of peak load"
method. Use of the examiner's recommended method would have resulted in excess capacity of
approximately 50% of the units EPEC was requesting be included in rate base. Appellants claim
the Commission's use of an improper method was the principal cause of the "no excess capacity"
finding.

 Two of EPEC's expert witnesses explained EPEC's method of determining reserve
requirements. The company uses one of the methods outlined by the Western Systems
Coordinating Council, an organization responsible for promoting reliable operations among the
interconnected bulk power system to which EPEC belongs. The Council recommends three
different methods of determining reserve requirements, of which the "largest single hazard plus
5%" is one. There was expert testimony that EPEC selected this method because, of the other
two possibilities, one would set an unnecessarily high reserve and the other would produce an
insufficient reserve to protect against a blackout in the event of a significant loss in system
generation capacity. Considering these expert opinions, we cannot say that reasonable minds
could not have reached the conclusion the Commission must have reached in order to make the
finding it did. We conclude that substantial evidence supports the Commission's adoption of the
"largest single hazard plus 5%" method of determining reserve requirements. 

 The City also complains that the Commission determined the overall demand on
the system to be much higher than it should have been, thereby inflating the system capacity found
necessary. The City contends the Commission erred by: (1) including in its calculation the power
EPEC has contracted to supply TNP; (2) omitting three gas-fired units from generation capability
because of plans to retire them early; and (3) adopting a maintenance schedule that requires
removal of some units from the line during the summer peak period. Two experts offered their
opinions that the Commission acted reasonably in approving the maintenance schedule and
including the TNP obligation in peak load. In addition, one witness recognized that EPEC's
objective in planning generation capacity was to "meet forecasted load demands with adequate
system reliability while minimizing total system cost." The Commissioners could reasonably have
found that adding two nuclear power units to the system and retiring three gas-fired units would
achieve this objective. We conclude that substantial evidence in the record supports the
Commission's finding that there is no appreciable excess capacity in the EPEC system.

B. Other Contentions.

 OPC complains that the Commission has abrogated OPC's right to represent its
clientsresidential and small commercial usersin future rate cases. OPC bases this contention
on Finding 107. The relevant portion of that finding states that the excess capacity findings in the
present case will not be considered "precedents in any manner in cases involving the addition of
future generating capacity to the system, including Palo Verde Unit 3, or in any reconsideration
proceeding conducted pursuant to paragraph 11 of the Amended and Restated Stipulation." The
finding merely recites the Commission's refusal to address issues not yet ripe for determination. 
OPC has had a full and fair opportunity to litigate the excess capacity issue with respect to Units
1 and 2. Even without Finding 107, general principles of issue preclusion would bar OPC from
relitigating the excess capacity issue with respect to those units. Finding 107 does no more than
that.

 OPC next complains of Findings of Fact 111-113; it asserts that each finding
requires additional findings of underlying fact. The challenged findings are as follows:



111. The largest single hazard plus five percent ("LSH + 5") criterion for
determining a reasonable reserve margin is used by EPEC and recommended by
the Western Systems Coordinating Council, of which EPEC is a member.


112. Based on the evidence presented, use of the LSH + 5 criterion is reasonable
for application to the EPEC system in this case.


113. Using the LSH + 5 criterion, EPEC should carry 258 MW of reserve
capacity in 1988.



These findings are not ultimate findings; therefore, the Commission had no duty to make
additional findings of underlying fact.

 OPC also argues that the Commission was bound to explain its reasons for rejecting
the examiner's recommendation and adopting a different method of determining reserve
requirements. Again, OPC has not shown any authority requiring the Commission to do so. 
Therefore, we also find this argument to be meritless.

 In its motions for rehearing to the Commission and at the trial court level, OPC
objected to the Commission's failure to explicate the relationship between the concept of excess
capacity and PURA's "used and useful" standard. We need not resolve this issue in order to
dispose of the present case; therefore, we express no opinion on the matter.

 We overrule the City's and OPC's fourth points of error.


COMMON FACILITIES


 As a part of its application to increase rates, EPEC requested that costs incurred
in constructing the facilities to be used in common by all of the generating units, including those
not yet completed, be included in rate base. The Commission found it reasonable to include such
costs and made two findings of fact about which OPC now complains.

 In its sixth point of error, OPC asserts generally that the Commission erred by
deciding to consider the common facilities as "plant-in-service." OPC argues that the
Commission, by refusing to apportion the costs of the common facilities to each unit, has changed
its position on apportionment questions and that such a shift in position is improper. OPC also
asserts that the findings of fact relating to treatment of common facilities costs are insufficient and
that additional findings of underlying fact are necessary to show the evidence on which the
Commission relied in determining whether to include the common facilities costs in rate base.

 OPC has failed to brief adequately its complaint on this issue. Each of its legal
contentions comprises but a single sentence, and only in conjunction with its change-of-position
complaint has OPC provided any supporting authority at all. OPC also fails to point out evidence
in the record demonstrating either that the Commission has erred or that any error has
substantially prejudiced OPC's rights. Finally, OPC cites no authority for the propositions that
the Commission was obligated to make more findings of fact than it did, that the Commission had
to allocate costs rather than following generally accepted accounting principles, or that OPC was
unable to present its appeal adequately because of the Commission's alleged failure to explain why
it declined to apportion the common facilities' capital costs. Such a complete failure to develop
and support a complaint waives the complaint. Helle v. Hightower, 735 S.W.2d 650, 654 (Tex.
App. 1987, writ denied). We conclude OPC has waived its sixth point of error, and we overrule
it.



INCOME TAXES


 In its final point of error, OPC generally challenges the cost-of-service
determination on grounds that the amount found includes a "hypothetical" federal income tax
expense. In the most cursory of fashions, OPC alleges the Commission erred in including the
federal income tax expense in EPEC's cost of service because: (1) no evidence supports the
inclusion; (2) the Commission made no findings of fact or conclusions of law regarding federal
income tax expense; and (3) the Commission failed to inquire whether EPEC had actually incurred
all of the tax expense. As a matter of interest, we note that OPC has overlooked Finding of Fact
186, which expressly addresses federal income tax expense. Consequently, OPC's complaint that
the Commission made no findings with respect to federal income taxes is meritless.

 OPC's briefing of this point of error is wholly inadequate. The only authority to
which OPC has drawn this Court's attention is the opinion in PUC v. Houston Lighting & Power
Company, 748 S.W.2d 439 (Tex. 1987). Even more than in its sixth point of error, this
multifarious seventh point contains conclusory statements unsupported by authority. 

 In its motion for rehearing, OPC complains that this Court "misunderstood" OPC's
position on this issue; there follows a lengthy exposition of the position OPC intended to argue
in its initial brief. The detailed discussion in OPC's motion for rehearing further underscores the
inadequacy of the argument on this point in its original brief.

 OPC has waived its seventh point by failing adequately to support or to argue the
offending issue in its original brief.


LEASE PAYMENTS ON UNIT 2


 As required by PURA § 63, EPEC notified the Commission of the sale/leaseback
arrangement for Unit 2. The sole issue to be determined as to that transaction was whether the
sale/leaseback was consistent with the public interest. In January 1987 the hearings examiner
stayed proceedings in the sale/leaseback matter so that the Commission could consider the public
interest issue along with EPEC's rate case. In response to a motion filed by EPEC, the
Commission consolidated the two matters under the docket number for the rate case.

 When the Commission rendered a final order, however, it did not decide whether
the sale/leaseback transaction was consistent with the public interest; instead, it specifically
reserved that issue for later determination. Nonetheless, the Commission made fact findings that
allowed Unit 2 lease payments to be included in EPEC's cost of service to the extent they did not
exceed the amount the Commission would have included in rate base for Unit 2 capital costs if
EPEC had retained an ownership interest. The partial inclusion of lease payments in cost of
service prompts the City's substantial evidence challenge in its final point of error.

 PURA § 63 requires a utility to report a contemplated or consummated transaction
within a reasonable time if the total transaction consideration exceeds $100,000. Further, the
section provides that



[o]n the filing of a report with the commission, the commission shall investigate
the same with or without public hearing, to determine whether the action is
consistent with the public interest. In reaching its determination, the commission
shall take into consideration the reasonable value of the property, facilities, or
securities to be acquired, disposed of, merged or consolidated. If the commission
finds that such transactions are not in the public interest, the commission shall take
the effect of the transaction into consideration in the rate-making proceedings and
disallow the effect of such transaction if it will unreasonably affect rates or service. 
The provisions of this section shall not be construed as being applicable to the
purchase of units of property for replacement or to the addition to the facilities of
the public utility by construction.



PURA § 63 (emphasis added). Pursuant to PURA, the Commission must, at some point, decide
whether the sale/leaseback transaction is consistent with the public interest. The statute designates
no time within which the Commission must make that determination after the utility files its
report. The section expressly allows the Commission to decide the issue without holding a public
hearing; consequently, we do not construe PURA to require the Commission to resolve that
question in the context of a formal ratemaking proceeding.

 The Commission has discretion to consolidate proceedings with common issues
when consolidation would serve judicial or administrative economy. See Alamo Express, Inc. v.
Union City Transfer, 309 S.W.2d 815, 821 (Tex. 1958). The City does not deny this, but asserts
that once the Commission had consolidated the proceedings, it was powerless to sever them. The
City contends that at that point the Commission became bound to settle the public interest question
in its order setting rates. This contention fails to recognize the Commission's discretion to
regulate its docket so that only issues which can reasonably and fairly be tried within the
framework of a single proceeding are tried together. We conclude the Commission has the power
to sever. Any other result would defeat the legislative intent in delegating duties to the
Commission for more efficient administration. Therefore, in the interest of accomplishing the
legislative purpose underlying the Commission's creation, we deem it essential that the
Commission's power to consolidate be balanced by a corresponding power to sever. During
the hearing, the Commission apparently concluded that "the effect" of the sale/leaseback
transaction did not include the entire amount of lease payments made. EPEC would have incurred
certain costs even if it had retained its ownership interest in the unit instead of arranging the
sale/leaseback. Therefore, even if the Commission were ultimately to find the transaction
inconsistent with the public interest, the cost that EPEC would have incurred had it retained
ownership would be includable in rates because it was not an "effect" contemplated by the
disallowance provision of PURA § 63. Consequently, the Commission did not err in including
this amount in cost of service.

 By post-submission brief, the City argues that deferral of the public-interest
determination implies a finding that EPEC failed to carry its burden of proof on that issue. In
support of this argument, the City directs our attention to the supreme court's recent decision in
Coalition of Cities for Affordable Utility Rates v. PUC, 798 S.W.2d 560 (Tex. 1990). The City
did not make this argument below; therefore, it is not properly before this Court. See City of San
Antonio v. Texas Water Comm'n, 407 S.W.2d 752 (Tex. 1966). 

 Even if we were to agree that the Commission impliedly found EPEC had failed
to carry its burden of showing that the transaction was consistent with the public interest, we
would find no reversible error in the inclusion of part of the payments in cost of service. Finding
of Fact 122 provides: "EPEC's proposed `book break-even' calculation of the portion of the lease
payment may be included in cost of service in this instance, as it is not in excess of the amount
that would result if calculated using the traditional ratemaking plant in service/rate base
methodology." The City fails to recognize that the Commission is responsible not only for
determining whether the transaction in question is consistent with the public interest, but also for
disallowing the effect of the transaction "if it will unreasonably affect rates or service." PURA
§ 63. Only if inclusion of the effect will unreasonably affect rates will it be disallowed. 
Therefore, Finding 122 implies, consistent with the Coalition analysis, that the Commission found
that EPEC carried its burden of showing that inclusion of the relevant portion of the lease payment
would not unreasonably affect rates. The City has not challenged this implied finding; therefore,
even if the City's untimely argument were correct, it would not show reversible harm. We
overrule the City's seventh point of error.


COST-OF-SERVICE ALLOWANCES


 The City makes several general complaints about the Commission's revenue-requirements determination and, in addition, specifically challenges five separate components of
the cost-of-service allowance. The general complaints are that: (1) substantial evidence does not
support the Commission's revenue requirements finding; (2) the Commission applied no statutory
standard in determining revenue requirements; and (3) the Commission failed to make all required
findings of underlying facts.

 We conclude that, except for the specific challenges to five component amounts,
the City has waived its complaints by failing to show that particular cost-of-service component
amounts are unsupported by substantial evidence. Nor has the City identified a statutory standard
requiring the Commission to supply findings of underlying facts in addition to those already made. 
Although the City contends that the Commission decided the matter without referring to PUC
Substantive Rule § 23.21(b), the findings obviously refer to that rule. Therefore, we overrule the
City's general complaints and proceed to address the challenges to specific component amounts.

A. Fuel and Purchased Power Expense.

 The City contends that the Commission overstated expenses for fuel and "purchased
power" because it included in that amount the price of 25 megawatts of electricity not actually
purchased by EPEC. 

 Staff witness Stan Kaplan calculated EPEC's reasonably predictable fuel costs based
on the assumption that the new rates would become effective January 1, 1988. In estimating the
amount of purchased power costs, Kaplan anticipated that EPEC would purchase 75 megawatts
in January 1988 and 50 megawatts per month for the balance of the calendar year. However, the
prolonged hearings delayed the new rates' effective date to a point approximately three months
beyond the January 1, 1988, date Kaplan had assumed. Nonetheless, the Commission's final
order was based on Kaplan's prediction, which included an anticipated first-month purchase of
75 megawatts. The City argues that the cost of 25 megawatts, which EPEC did not purchase after
the new rates became effective, should be excluded from cost of service.

 A utility's allowable expenses are calculated by adjusting its historical test year
expenses for known and measurable changes. 16 Tex. Admin. Code § 23.21 (b) (1991). Based
on the evidence filed before and the testimony adduced during the hearing, the Commission
determines the amount of the utility's reasonably predictable purchased power costs for the "rate
year," i.e., the first twelve months after the rates will become effective. 16 Tex. Admin. Code
§ 23.23 (b)(2)(B) (1991). This determination inherently involves estimation and the making of
a number of assumptions. One necessary assumption is that rates will become effective on some
specific date. In the present case, that assumption turned out to be incorrect by three months. 
On that basis, the City argues that the Commission's determination of EPEC's reasonable and
necessary operating expenses was invalid. We do not agree. 

 If we were to hold the relevant determination in this case invalid, we would be
imposing an onerous burden on the Commission; it would have to recalculate each element of
every component of revenue requirements whenever a witness's assumption that new rates would
become effective on a certain date later proved to be incorrect. The recalculation time alone could
conceivably delay rendition of a new order long enough once again to alter the effective date. 
Such a process might never end. We conclude that, under the circumstances of this case, the
Commission did not abuse its discretion and did not act arbitrarily or capriciously by refusing to
recalculate purchased-power cost once it became apparent that the actual effective date would not
coincide with the assumed effective date. We overrule the City's contention regarding this
component.

B. Operating and Maintenance Expenses.

 The City next asserts that the Commission found an improper amount of "operating
and maintenance expenses" because it: (1) listed the expense as a single-line item; (2) provided
no findings of underlying fact to explain its reasoning in adopting the figure; (3) found a figure
unsupported by any evidence; and (4) included rate-case expenses in operating and maintenance
expense after having severed them out of the docket. 

 The City points to no duty compelling the Commission to find, as underlying facts,
the amounts comprising a sum which is itself a component of a statutorily mandated criterion. 
PURA directs the Commission to find the amount of "reasonable and necessary operating
expenses," not operating and maintenance expense; likewise, PURA does not expressly mandate
consideration of operating and maintenance expense when the Commission determines net income. 
See PURA § 41(c). In the present case, the Commission found specific amounts for "operating
expenses" and for that category's components, one of which was labelled "operating and
maintenance expenses." Because the Commission had no duty to itemize the subcomponents of
"operating and maintenance expenses," its failure to find them as underlying facts cannot be
considered error. See, e.g., Frost v. PUC, 672 S.W.2d 883, 885 (Tex. App. 1984, writ ref'd
n.r.e.). We conclude the Commission did not act arbitrarily and capriciously in declining to
further subdivide the components of operating expense.

 During the proceeding, EPEC offered evidence of the amount of operating and
maintenance expense, to which the City did not object. Although this figure was undisputed, the
Commission reduced it before including the amount in revenue requirements as cost of service. 
We will not reverse the Commission's order absent a showing that the City's substantial rights
were prejudiced by the inclusion of the reduced expense figures in cost of service. Since the City
has not shown harm, we overrule its challenge.

 Finally, the City contends the Commission improperly included the rate-case cost
in operating and maintenance expense. The City bases its claim of error on the alleged prior
severance of the rate-case expense issue from the proceeding. In paragraph 16 of its final order,
the Commission held that "[t]he issue as to the reasonableness of the Company's and the Cities'
rate case expense incurred in the prosecution of this case is severed from this docket." The City
argues that, because of paragraph 16, no regulatory commission expense should be included in
the revenue requirements. We do not agree. The Commission's staff provided testimony
supporting the findings of that portion of the regulatory commission expense that was undisputed,
and the Commission included only these undisputed amounts in cost of service.

 We conclude that the City's contentions regarding operating and maintenance
expense are meritless. 

C. Employee Benefits.

 The City next challenges the Commission's findings on employee benefits. It
asserts that the Commission erred by concluding that the evidence supported staff witness Young's
adjustments to the 401-k plan expenses and the Tax Reduction Act Stock Option Plan (TRASOP)
expenses. 

 The City argues that the Commission abused its discretion by finding a 401-k plan
expense in excess of the amount requested by EPEC was reasonable and necessary when the
evidence does not support the finding. According to the City, by doing so, the Commission has
violated its own rules. The City has not indicated which of its substantive rules the Commission
violated, and it identifies no evidence that would tend to show that the Commission acted without
reference to any guiding legal principles. In addition, the staff offered evidence that the greater
sum was necessary to provide the benefit to all existing employees and reasonably anticipated
additional employees. We conclude that substantial evidence supports the Commission's findings
that the amount recommended by the staff was reasonable and necessary.

 The City next contends that the Commission erred in including any TRASOP costs
in employee benefits expense. The basis for this argument appears to be that the Commission had
rejected inclusion of these expenses in two prior dockets; in the City's view, apparently, the
Commission's prior holdings estop it from including the expense in later dockets. The City cites
no authority for this proposition.

 The legislature has given the Commission discretion to determine which of a
utility's expenses are reasonable and necessary and, hence, may be recovered. PURA § 41(c). 
Because the reasonableness determination is one committed to agency discretion, it may be
overturned only by a showing that the agency either based its decision on legally irrelevant
factors, failed to consider legally relevant factors, or reached a completely unreasonable result
after weighing only legally relevant factors. Gerst, 411 S.W.2d at 360; Statewide Convoy, 753
S.W.2d at 804. The City has not shown that the Commission erred in any of these respects. 
Consequently, we conclude that the City's attacks on the Commission's findings regarding
employee benefits are without merit.

D. Taxes Other Than Federal Income Taxes.

 The City contends that no evidence supports the Commission's finding of a specific
amount for expenses incurred for taxes other than federal income taxes. This item of expense
increased by $992,773 after the stipulation phase of the hearing, and the City claims that neither
EPEC nor the staff can identify evidence supporting the upward adjustment.

 Contrary to the City's assertion, EPEC offered testimony supporting the tax
expense alterations. EPEC's witness Mayhew testified that taxes are uniquely tied to other
elements of revenue requirements. Therefore, when other components of the revenue requirement
were adjusted, the tax expense necessarily was changed to accurately reflect the expense EPEC
would incur. Mayhew explained that one way of isolating the tax effect of alterations in revenue
requirements would be to compare the two reconciliation statements, line by line, identifying
changes and recalculating taxes based on them. The City has not attempted to show that the
recalculation was done incorrectly, and we conclude that its contention on this issue is meritless.

E. Depreciation Add-Back.

 In its final challenge to the Commission's cost-of-service findings, the City attacks
Finding of Fact 187. By that finding, the Commission included in cost of service an element
referred to as "depreciation add-back," the purpose of which was to account for EPEC's transition
from a "flow-through" system of tax accounting to a "normalization" system. The City challenges
this finding on the grounds that: (1) inclusion of "depreciation add-back" amounts to retroactive
ratemaking, (2) the inclusion is not supported by substantial evidence, and (3) certain necessary
findings of underlying fact have been omitted.

 The City complains that it "cannot know how the Commission reached its
determination because there are no underlying findings of fact." Without providing legal authority
for its position, the City argues that the Commission failed in its duty to make additional findings
of underlying fact that would show "a logical nexus between the conclusion of the underlying
fact[s] and the evidence." For the same reasons that we held such findings of "nexus"
unnecessary in connection with the Commission's "decisional-imprudence" findings, we conclude
they are also unnecessary here.

 The City next argues that inclusion of depreciation add-back constitutes retroactive
ratemaking because



[t]he evidence does not identify any shortfall in depreciation reserves to cover test
year tax timing reversals. The evidence does show that some of the alleged
deficiency may be attributed to years before the Company's first rate proceeding,
which would mean that the burden imposed on ratepayers by the Commission as
a result of Finding of Fact No. 187, inured to the benefit of the Company and its
shareholders in the past.



The City misconstrues the nature of the transition from a flow-through accounting system to a
normalization system.

 As is common for utilities, EPEC depreciated its assets at an accelerated rate for
tax purposes while depreciating them using the straight-line method on its ratemaking books. 
Under a flow-through system, any tax benefit that resulted from the practice of keeping one set
of books for tax purposes and another for ratemaking purposes was passed on to the ratepayers
as it accrued. As time passed, the utility would incur, first, a very low, then a medium, and,
finally, a relatively high level of income tax liability. The portion of rates attributable to income
taxes that ratepayers paid over the asset's life would also rise, corresponding to the utility's actual
tax liability. 

 Under normalization, on the other hand, while actual tax liability follows the same
increasing path, rates reflect that the ratepayers' contribution to the payment of the utility's
income taxes remains constant throughout the asset's useful life. To the extent that this creates
an "overpayment" of taxes during the early years of an asset's useful life, the utility accumulates
the excess in a deferred-income-tax account. The accumulated funds are later used during the
stage of the asset's useful life when ratepayer payments are not enough to satisfy the utility's
actual tax liability. At the end of the asset's useful life, the total overpayments and underpayments
will match, such that ratepayers will have paid an amount equal to the actual tax liability incurred
by the utility. See generally GTE-SW, slip opinion at 16-17.

 Federal law now requires that all public utilities which accelerate depreciation for
federal income tax purposes use the normalization system. 26 U.S.C. § 168(f)(2), (i)(9) (Supp.
1992). In most cases, a utility that had been using the flow-through system had to switch to
normalization in the middle years of the useful lives of its assets, rather than at the beginning or
end of those lives. As a result, the utility had not built up a deferred-tax account with which to
pay its taxes during the later years in which its actual tax liability will exceed the tax payments
ratepayers will be making under normalization. The utility therefore faces an increasing tax
liability without a means of recovering the increased expense; yet, in spite of the deficiency in
funds available to satisfy the tax liability, the utility must pay its taxes as they become due. 
Consequently, in this case, the Commission has included in cost of service a one-time adjustment
to put EPEC in the position it would have occupied had it used normalization all along. 

 The City complains bitterly about the allegedly retroactive effect of the new rates
because the adjustment the Commission made is called "depreciation add-back." This label does
indeed make it sound as if the Commission has obliged present and prospective ratepayers to pay
the utility a second time for assets already depreciated. However, we do not decide the propriety
of Commission action based on the name the Commission has elected to apply to it. The true
effect of the "depreciation add-back" adjustment is to allow the utility to obtain from present and
prospective ratepayers its actual current and future tax expenses. Consequently, this adjustment
to the deferred-tax account does not, in any way, constitute retroactive ratemaking. As a final
matter, we note that the City's assertion of inadequate evidence to reveal a shortfall in the reserves
needed to pay taxes in the test year or ensuing years is incorrect. Moises Rodriguez, the
supervisor of the EPEC's tax accounting section, testified that, while EPEC had adjusted reserves
to compensate for the shift to normalization as it affected the timing differences related to
depreciation, EPEC had not done so for differences related to the tax "bases" of all its assets. In
Mr. Rodriguez's words, "[t]he net result is that the current accumulated deferred Federal income
tax balance does not fully reflect the timing difference that occurred prior to 1979." Rodriguez
concluded that an adjustment was necessary to bring EPEC into compliance with federal law. We
therefore conclude that substantial evidence supports the Commission's adjustment to the deferred-tax element of EPEC's cost of service.

 Having concluded that all of the City's challenges to the Commission's cost-of-service allowances are without merit, we overrule the City's sixth point of error.


 EXCLUSION OF TSA DURING PROCEEDINGS


 On October 22, 1987, the examiner orally granted EPEC's motion to strike TSA
as a party, excluding TSA from the proceedings. TSA appealed the decision to the Commission,
but the Commission extended its time for making a decision such that it rendered the order setting
new rates before ruling on TSA's appeal. In the meantime, on November 6, 1987, EPEC
withdrew its motion to remove TSA from the proceedings, and the examiner readmitted TSA and
reinstated its party status.

 During the fifteen days that TSA did not participate in the hearing, more than thirty
witnesses offered testimony on various issues. TSA contends that the October 22 order violated
its due process rights by preventing it from cross-examining these witnesses. In addition, TSA
alleges that the Commission intentionally postponed considering its appeal solely to prevent TSA
from obtaining a stay of the proceedings from the Texas Supreme Court until such time as that
court could determine TSA's entitlement to party status. Finally, TSA asserts that the
Commission erred in refusing to make findings of fact and conclusions of law concerning the due
process claim.

 The supreme court's holding in State v. Thomas, 766 S.W.2d 217 (Tex. 1989), is
dispositive of TSA's complaint. TSA had the right, under the Texas Constitution, to intervene
in the proceedings. Id. at 219. However, the wrongful exclusion of TSA will necessitate reversal
of the Commission's order only if the error prejudiced substantial rights of TSA. APTRA
§ 19(e).

 After TSA appealed the October 22 order to the Commission, that body granted
itself five extensions of time to consider the complaint. These extensions allowed the Commission
to avoid deciding the issue; the final extension postponed consideration of the appeal until after
the Commission had signed a final order in the docket. Nevertheless, TSA participated as a party
in all proceedings after its reinstatement on November 6. TSA suffered no harm, therefore, from
the Commission's failure to rule on its appeal. The harm, if any, stems from TSA's inability to
cross-examine the thirty-plus witnesses who testified while it was absent from the proceedings. 

 TSA does not complain of its inability to cross-examine approximately two dozen
of the witnesses who testified during its absence. TSA claims to have suffered harm only by
losing the opportunity to cross-examine: (1) three prudence and deferral witnesses who had
testified during the first two days TSA was excluded; and (2) four rate-design witnesses. As to
the latter, TSA has not preserved any error; the examiner specifically stated in his oral ruling that
he would permit TSA to recall and cross-examine any rate-design witnesses. As to the former,
the examiner made it clear he would entertain a motion from TSA to recall them.

 TSA recalled only EPEC witness Mayhew, a rate-design expert. It made no motion
to recall and cross-examine the three prudence and deferral witnesses. Further, while TSA was
still present during the original rate-base phase of the hearingthe only phase to which deferral
and prudence issues would have been pertinentit did not seek to cross-examine witnesses or
present evidence of its own. Under these circumstances, and because TSA failed to request
available relief that would have made it whole, we cannot say that the error in excluding TSA for
fifteen days prejudiced substantial rights of TSA. We therefore overrule TSA's first point of
error.

 In addition, because Thomas dictates the conclusion that TSA should not have been
excluded, we need not rule on TSA's complaint regarding the Commission's failure to make the
requested findings of fact and conclusions of law on that issue.


TSA'S RATE CLASSIFICATION


 The third phase of the proceedings, the rate-design segment, afforded the parties
an opportunity to offer evidence in support of or in opposition to the proposed method of
apportioning the anticipated rate increase among the various rate classes. In addition, because
TSA sought to be reassigned to the city/county governmental-consumer class (rate class 41) from
the general services class (rate class 24), the parties also offered evidence on the classification
issue. The examiners recommended that TSA not be reassigned and that the proposed
apportionment method be approved. The Commission adopted both recommendations and the
examiners' underlying reasoning. In its second and third points of error, TSA argues that the
Commission erred by approving a rate for TSA that is not cost-based and by refusing to move
TSA to the city/county rate class.

A. Rate Class 41

 TSA urges us to conclude that the Commission erred in refusing to include TSA
in the city/county rate class, which arguably pays lower rates than the general services class. TSA
asserts that there is no reasonable basis for differentiating TSA from the city and county
governmental consumers; that EPEC offered no proof of a factor justifying different treatment for
TSA than for the city and county consumers; and consequently, that PURA § 38 required the
Commission to reassign TSA to the city/county class to prevent EPEC from charging
unreasonably discriminatory rates.

 The Commission has broad discretion to determine whether a particular rate design
would result in just, reasonable, and non-discriminatory rates. In making the determination, the
Commission may consider factors in addition to the cost of providing service, keeping in mind
the overriding considerations of consistency and the utility's burden of proving that its proposed
rates are just and reasonable. See PURA § 40; Texas Alarm & Signal, 603 S.W.2d at 773. 
Absent unreasonably discriminatory rates, we will not overturn the Commission's approval of a
rate design. PUC v. AT&T Communications of the Southwest, 777 S.W.2d 363 (Tex. 1989). 

 A customer seeking reassignment to a different class must show that its conditions
of service are similar to those of the members of the class to which it seeks reassignment. The
issue is one of fact, to be resolved by reference to the particular circumstances of each case. Ford
v. Rio Grande Valley Gas Co., 174 S.W.2d 479, 480 (Tex. 1943); Amtel Communications v.
PUC, 687 S.W.2d 95, 102 (Tex. App. 1985, no writ). Existing classification schemes previously
approved by the Commission are, prima facie, not unreasonably discriminatory, and the
complaining party has the burden of proving that the classification produces unreasonably
discriminatory rates. Ashley v. City of Gilmer, 271 S.W.2d 100, 102 (Tex. Civ. App. 1954, writ
ref'd); see also Ford, 174 S.W.2d at 480; Amtel Communications, 687 S.W.2d at 102.

 Resolution of the burden-of-proof issue disposes of the dispute here. TSA failed
to offer proof that its load characteristics were similar to those of the city and county
governmental customers. In addition, TSA offered no proof that its constituent agencies are
similar to the city/county consumers in other respects which the Commission considers when
classifying a customer. Having offered no proof of these similarities, TSA has failed to carry its
burden of showing that its rate is unreasonably discriminatory.

 Another consideration which persuades us that the Commission did not abuse its
discretion in refusing to reassign TSA is that the Commission's final order, following a suggestion
in the Examiners' Report, directed EPEC 


to perform the appropriate studies, so that during [EPEC's] next general rate case,
the load and usage characteristics at the state agencies, as a group, including any
state universities and colleges, can be compared to the load and usage
characteristics of both Rate Classes 24 and 41.



 Considering that the current classification scheme has apparently existed
unchallenged for some fifty years, that the Commission has expressed its intention to investigate
TSA's assignment to the general services class in the next rate case, and that requiring EPEC to
produce the needed information in this proceeding could have resulted in a significant delay, we
conclude that the Commission acted reasonably by refusing to reassign TSA to the city/county rate
class. We overrule TSA's third point of error.

B. Cost-Based Rates

 TSA next contends that it is entitled to rates based on the utility's actual cost of
serving only the agencies constituting TSA. To support this argument, TSA cites four Texas
constitutional provisions it claims require EPEC to charge TSA a rate based on the cost of serving
only TSA. See Tex. Const. art. III, §§  44, 51, and 53 (1984), and art. XVI, § 6 (Supp. 1992). 

 The cited constitutional provisions prevent the State from depleting its treasury by
disbursing State funds without obtaining a corresponding benefit for the public. See, e.g.,
University of Texas System v. Robert E. McKee, Inc., 521 S.W.2d 944, 948 (Tex. Civ. App.
1975, writ ref'd n.r.e.); State v. City of Austin, 331 S.W.2d 737, 742 (Tex. 1960); Olshan
Demolishing Co. v. Angleton Indep. School Dist., 684 S.W.2d 179, 185 (Tex. App. 1984, writ
ref'd n.r.e.); and State v. City of Dallas, 319 S.W.2d 767, 775-76 (Tex. Civ. App. 1959), aff'd,
331 S.W.2d 737, 742 (Tex. 1960). We need not decide, however, whether rates that are not cost-based violate these provisions. TSA's challenge to the proposed rate, like its challenge to its
classification, is resolved by examining the burden of proof on the issue. Even assuming for the
purposes of this discussion that TSA correctly identified a constitutional entitlement to cost-based
rates, we conclude that it had the burden of proving that its new rates were not cost-based. 
Because it did not carry this burden, we will overrule its second point.

 TSA insists that EPEC had the burden of proving that the rate it proposed for TSA
was based on its cost of serving TSA. This argument is premised on: (1) the overall burden of
proof a utility bears in ratemaking proceedings imposed by PURA § 40; and (2) EPEC's exclusive
control of cost-of-service information. We conclude that these considerations are insufficient to
impose on EPEC the burden of proving that its proposed rates are based on its costs to serve this
select group of customers.

 All individual state agencies were originally assigned to the general services rate
class fifty years ago; until now, they have not complained of that assignment. The agencies
comprising TSA intervened in this ratemaking proceeding as a newly formed group seeking to be
reassigned to the city/county class. The crux of the group's cost-based-rates argument is that
EPEC was obligated to prove that the rate EPEC anticipated charging the group was based on the
utility's cost of serving only the members of the group. We conclude that the Commission acted
reasonably both in refusing to impose such a burden on EPEC and in ordering EPEC to produce
information necessary to evaluate the issue in the next ratemaking case.

 The Texas Supreme Court has held that a utility is not required to compare profits
and rates of return between services. Texas Alarm & Signal, 603 S.W.2d at 772. The
considerations supporting the decision not to require such a comparison also support the decision
not to require a utility to determine and offer proof of the costs of serving individual customers
or subclasses of customers who share one or more characteristics. Cf. City of Corpus Christi v.
PUC, 572 S.W.2d 290, 294-96 (Tex. 1978). Comparing rates of return between services requires
the utility to determine the expenses it incurred and the adjusted value of property it used in
producing each service. Determining cost-based rates for subclasses of consumers would require
the utility to determine the expenses it incurred and the adjusted value of property it used in
producing service for each individual customer. This would be even more onerous a burden than
that rejected by the supreme court in Texas Alarm & Signal. In addition, requiring EPEC to
determine costs of service for individual customers would generate more costs, which would then
be passed on to consumers. The increase in rates that could result from added costs of the
ratemaking proceeding is a factor the Commission can and should consider. Id. at 772 n.7.

 Allocation of the burden of proof to a complaining party is reasonable in
circumstances in which individual customers have combined to form a subclass, which then asserts
an entitlement to rates based not on the costs of serving all customers, but of serving only the
members of the subclass. If the complaining subclass were not assigned the burden of proof in
such circumstances, the utility would arguably be obligated, in every rate-making proceeding, to
present evidence of the cost of serving every subclass that customers could define based on shared
characteristics. Even assuming that it would be possible for the utility to satisfy such an
obligation, it is questionable whether the vastly increased costs which such a presentation would
entail would be in the public's interest.

 Further supporting our conclusion that the Commission did not abuse its discretion
in approving the new rates is the fact that TSA did not request the information before the
hearings, even though the Commission could have compelled EPEC to produce the information
necessary to prove TSA's claim of being overcharged. Instead, TSA asserted, during the rate-design phase, that it needed the information but had no access to it. Because TSA made little
attempt to acquire the information it needed to carry its burden of proof, its policy argument is
unsympathetic. Therefore, even assuming for the sake of argument that TSA's constitutional
theory is correct, the record it has brought this Court is insufficient to show harm. We find no
reversible error on this record. TSA's second point of error is overruled.


CONCLUSION


 In the context of a myriad of complex issues and often-contentious parties, the
Commission must be allowed to weigh all competing interests in setting rates that will be fair to
all consumers. With the exception of the use of deferred accounting as to EPEC's carrying costs
incurred during the regulatory-lag period, we conclude that the Commission acted within its
discretion in setting new rates for EPEC. 

 We reverse that portion of the trial court's judgment which affirmed the
Commission's approval and use of deferred accounting as to the carrying costs incurred by EPEC
between the date Palo Verde Units 1 and 2 became commercially operational and the effective date
of the new rates. We affirm the remainder of the trial court's judgment. We remand the cause
to the Commission for such further proceedings as may be necessary or appropriate to implement
this Court's judgment.



 

 J. Woodfin Jones, Justice

[Before Chief Justice Carroll, Justices Aboussie and Jones]

Affirmed in Part; Reversed and Rendered in Part

Filed: August 26, 1992

[Publish]
1. All of the affected cities set rates within their respective city limits prohibiting EPEC
from recovering its nuclear plant investment. Only El Paso sought review of the
Commission's order.
2. EPEC, the Commission staff, and four corporate intervenors which purchased significant
amounts of electricity from EPEC all signed the stipulation.
3. All parties appear to agree that, to some degree, EPEC made imprudent decisions. On its
face, PURA § 41(a) contemplates an imprudence disallowance only within the framework of a
request that "construction work in progress" be included in rate base. The parties, however,
have not briefed or argued whether a "prudence" standard governs the inclusion of new
nuclear plant-in-service in rate base. We will therefore discuss appellants' points in the terms
they have chosen. We do not express an opinion on the possible existence of a distinction
between the reasonableness standard guiding the PUC in setting rates and the prudence
standard it uses pursuant to PURA § 41(a) in deciding whether to include the value of
construction work in progress in rate base.
4. We express no opinion on the proposition that, because the Commission's prudence
decision and resulting disallowance rested on a number of factors, the Commission could
reasonably have concluded that the substantial evidence would support a figure anywhere
within the range from zero to 50% of the total project costs.
5. We construe OPC's allegation to refer to the requirements of section 16(b), which deals
with findings of fact. APTRA § 16(e) addresses agency motions for rehearing.

6. "Regulatory lag" is the period between the date a new plant begins commercial operation
(the "in-service" date) and the effective date of the new rates that result from including the
new plant's costs in rate base.
7. "Deferral" is an accounting procedure a utility can use to record all costs of a certain type
in two accounts, one an expense account and the other a capital asset account. As the expense
account balance increases, so does the capital asset account balance, so that the two balances
remain identical. Recording costs this way preserves evidence the utility may later use to seek
inclusion of the capital account balance in rate base and a corresponding increase in rates.
8. TSA also purports to complain of the deferral procedure. However, TSA failed to
address the alleged error in its motions for rehearing to the agency. Therefore, it has waived
any error. APTRA § 16(e); Burke v. Central Educ. Agency, 725 S.W.2d 393, 396 (Tex. App.
1987, writ ref'd n.r.e.).
9. The City did not preserve a section-41(a) argument in its motion for rehearing to the
Commission. The City also argues in its brief to this Court that the Commission failed to
make necessary findings of underlying fact to support its conclusion that Unit 2 costs should
be included in rate base, but the City likewise did not assign such failure as error in its motion
for rehearing. Both complaints have been waived. APTRA § 16(e); Burke v. Central Educ.
Agency, 725 S.W.2d 393, 396 (Tex. App. 1987, writ ref'd n.r.e.).
10. The relevant sections of PURA originally provided:


 Sec. 39. In fixing the rates of a public utility the regulatory authority
shall fix its overall revenues at a level which will permit such utility to recover
its operating expenses together with a reasonable return on its invested capital.


 Sec. 40. (a) The regulatory authority shall not prescribe any rate which
will yield more than a fair return upon the adjusted value of the invested capital
used and useful in rendering service to the public.


* * *



 Sec. 41. The components of adjusted value of invested capital and net
income shall be determined according to the following rules:

 (a) Adjusted Value of Invested Capital. Utility rates shall be based upon
the adjusted value of property used by and useful to the public utility in
providing service including where necessary to the financial integrity of the
utility construction work in progress at cost as recorded on the books of the
utility. The adjusted value of such property shall be a reasonable balance
between original cost less depreciation and current cost less an adjustment for
both present age and condition. The regulatory authority shall have the
discretion to determine a reasonable balance that reflects not less than 60% nor
more than 75% original cost, that is, the actual money cost, or the actual money
value of any consideration paid other than money, of the property at the time it
shall have been dedicated to public use, whether by the utility which is the
present owner or by a predecessor, less depreciation, and not less than 25% nor
more than 40% current cost less an adjustment for both present age and
condition. The regulatory authority may consider inflation, deflation, quality of
service being provided, the growth rate of the service area, and the need for the
public utility to attract new capital in determining a reasonable balance.


1975 Tex. Gen. Laws, ch. 721, §§ 39-41, at 2341-42 (PURA §§ 39-41, since amended); see
also Southwestern Bell Tel. Co. v. PUC, 571 S.W.2d 503, 512-16 (Tex. 1978).
11. There are actually two types of such "costs" associated with capital construction
projects: (1) interest paid on debt capital (i.e., borrowed funds); and (2) inability to earn a fair
return on equity capital. While the difference between the two is relevant for some purposes,
it does not appear to be so for purposes of our decision in the present case. Accordingly, we
refer to both collectively as "carrying costs."
12. "Since no program of rate regulation is self-executing, one of the most important virtues
of an original cost valuation method is that of relative ease of administration." H. Louis
Nichols & Randall Hagan Fields, Rate Base Under PURA: How Firm is the Foundation?, 28
Baylor L. Rev. 861, 866 (1976).
13. Our holding does not prevent post-in-service carrying costs from being amortized and
recovered by a utility; it merely prevents them from being included in rate base. Moreover,
even if the practical effect of this holding were to prevent recovery of such costs incurred
during regulatory lag, "[a]ny change in protection for the utility against undue regulatory lag
should come from the legislature." Railroad Comm'n v. Lone Star Gas Co., 656 S.W.2d 421,
427 (Tex. 1983).
14. One commentator has recently argued against giving undue importance to the
"thereafter" language contained in many state utility regulatory acts:


It is difficult to understand why legislatures would have delegated such broad
powers to commissions, but would have simultaneously limited that authority
with off-hand wording in a provision merely describing the process for the entry
of a rate order. The most probable reason, then, for the inclusion of the
"thereafter" language in the enabling statutes is the simple fact that after the
commission enters a rate order, a utility cannot mechanically collect rates in the
past.


. . . 


. . . If commissions in their rate orders are allowed to consider only losses or
gains forecasted to occur "thereafter," then it is difficult to discern how
commissions have the authority to correct mistakes in past rate orders, to allow
recoveries for past extraordinary gains or losses, to change accounting treatment
for past gains or losses, or to grant refunds or surcharges after reversal of a rate
order.


Stefan Krieger, The Ghost of Regulation Past: Current Applications of the Rule Against
Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 1034-35
(1991). 
15. A mechanical recitation of this rule to support application of the retroactive-ratemaking
prohibition may not be justified. See Krieger, supra at 1035-37. Professor Krieger points out
that many states, including Texas, expressly require the use of adjudicative rather than rule-making procedures for rate hearings. Id. at 1037; see APTRA § 3(2).
16. Within the context of this opinion, we need not decide whether the language the supreme
court used in Goeke reduces the requirements set forth in Charter-Medical and Allied Bank in
order for underlying findings of fact to be considered sufficient to comply with APTRA
§ 16(b).